THEODORE SIMON AND ANOTHER v. MILWAUKEE
AUTOMOBILE MUTUAL INSURANCE COMPANY
AND OTHERS.

115 N. W. (2d) 40.

April 27, 1962—No. 38,268.

*Rich & Johnson,* for appellant.

*John M. Fitzgerald* and *Ray G. Moonan,* for respondents Simon.

*Young, Kunz & Mueller,* for respondents Lovaas, plaintiffs in the original actions.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order denying a motion of defendant Milwaukee Automobile Mutual Insurance Company[1] for amended findings of fact, conclusions of law, and order for judgment or, in the alternative, for a new trial, and also from a judgment entered pursuant to the court's order.

The present action is brought for a declaratory judgment to determine the liability of defendant insurer under a policy of automobile insurance.

The action stems from suits in which verdicts were recovered against plaintiffs as the result of an automobile accident which occurred on September 7, 1958. On that date and for some time prior thereto, Theodore Simon was the owner of a 1957 Chevrolet automobile insured by defendant with policy limits of $50,000 for injury to one person and $100,000 for one accident. Theodore's father, James J. Simon, owned a 1951 Chevrolet automobile insured by General Fire & Casualty Company with policy limits of $10,000 on one person and $20,000 on one accident.

---

[1]While there are several defendants named in the complaint in this action, this appeal involves only defendant Milwaukee Automobile Mutual Insurance Company. Where reference is made to defendant herein, it is to such defendant only.

In the original actions brought by representatives of parties injured or killed as a result of the accident, verdicts considerably in excess of the policy limits of the insurance carried on the automobile owned by James Simon were recovered. General Fire & Casualty Company paid these verdicts up to the amount of the policy limits, and plaintiffs now seek to compel defendant in this action to pay the balance of the verdicts.

On the day of the accident, through arrangements made with his mother, Theodore and his father exchanged cars for the day, and the accident happened while Theodore was driving the automobile owned by his father, James Simon.

The defense of the original actions was tendered to defendant in this action, but it refused, claiming that the policy covering the automobile of Theodore did not cover the liability involved in the original actions. Defense was thereupon undertaken by General Fire & Casualty Company, the insurer on the policy issued to James Simon.

The policy covering the automobile owned by Theodore Simon contained provisions for coverage while the insured was driving other automobiles, with exceptions. The pertinent provisions of the policy read:

"V.  Use of Other Automobiles. If the named insured is an individual * * * and if during the policy period such named insured * * * owns a private passenger automobile covered by this policy, such insurance as is afforded by this policy under coverages A * * * with respect to said automobile applies with respect to any other automobile, subject to the following provisions:

*     *     *     *     *

"(d)  This insuring agreement does not apply: (1)· to any automobile owned by or furnished for regular use to either the named insured or a member of the same household * * *."

Inasmuch as the determination of the present appeal involves a question as to whether Theodore Simon was a member of the same household as James Simon, it is necessary to state the facts relating to the manner in which the two plaintiffs lived at and prior to the time

of this accident. The record is voluminous, but the facts may be somewhat condensed.

James J. Simon had lived and raised his family on a farm of 160 acres about 6 miles southeast of New Prague, in Rice County, Minnesota. He also owned a farm of 160 acres about 9 miles northeast of New Prague, in Scott County. These farms will be referred to hereinafter as the Rice County farm and the Scott County farm.

James Simon and his wife had three daughters and four sons, James, Jr., Norbert, Bernard, and Theodore. From 1951 to 1953, James, Jr., and Theodore lived at and took care of the Scott County farm. Theodore was then about 19 to 21 years of age. From 1953 to 1955, Theodore was in the armed services, and Norbert lived on the Scott County farm. In 1956, James, Jr., was married, and his father set him up on a third farm near New Prague that is not involved in this action. Norbert was married in 1957. He had then been living on the Scott County farm for some time. About 2 months after his marriage, he met his death in an automobile accident. He had been operating the Scott County farm under a crop-share lease with his father.

In 1955, Theodore was discharged from the Army and returned to his father's Rice County farm and lived there much as he had done before. When Norbert met his death, Theodore looked after the Scott County farm. He had been planning to marry a young lady as soon as she finished high school in June 1958. When Norbert died, his widow left the farm and went back to her parents, and Theodore then made arrangements to buy the furniture on the Scott County farm in anticipation of his forthcoming marriage. He actually paid for it in October 1958. It was their plan that as soon as they were married he and his wife would live on the Scott County farm. They were in fact married on September 23, 1958, 16 days after this accident occurred.

On the Scott County farm were 20 head of milch cows, some hogs, and from 275 to 300 laying chickens. On March 5, 1958, Theodore and his father entered into a written lease of the Scott County farm on a fifty-fifty basis, Theodore to manage and control the farming operations and his father to furnish the farm and equipment. Theodore was then enrolled in a GI Bill of Rights farm training program which had the prerequisite that he have a farm under his control.

Theodore continued to live at his father's home until his marriage. Routinely, he would have breakfast at home and leave for the Scott County farm early in the morning to take care of the chores and do the other work required there. He customarily spent all day at the Scott County farm. He usually returned to his father's home for dinner and, for the most part, spent his nights there. He did spend a few nights at the Scott County farm from time to time. The testimony is that he spent 9 or 10 nights each in the months of July and August and 3 or 4 nights each in the months of April, May, and June of 1958. He spent no nights on the Scott County farm during the month of the accident. During the winter of 1957-1958 he spent some nights there looking after cows that were about to freshen or sows that were about to farrow.

The evidence shows that, except for the heavier work such as plowing, Theodore completely maintained the Scott County farm in the spring of 1958. He took care of the house and the grounds and did all the chores. He had some of his clothes there and some of them at his father's home. His mother did his laundry, and he received his mail at the Rice County farm.

After the accident, Theodore signed a written statement on September 11, 1958, in which he said:

"I live at R # 2 about 5 miles SE of New Prague Minnesota. I live with my parents Mr. & Mrs. James J Simon. They own a 160 acre farm. I operate the farm with them. * * * Riding with me were: Bernard Simon (brother who lives at home age 25 years) * * *. I had ate dinner before leaving home * * *.

*    *    *    *    *

"After leaving the accident time I got home was about 9 P M. When at home my father was their. He & my mother had come home on # 19 came right by the accident area. * * * He had my car at the time returning home."

On September 16, 1958, Theodore Simon signed a sworn application for a marriage license in which he stated that his home was in Rice County. The license to marry was issued by the clerk of District Court of Rice County. The certificate of marriage issued by the priest

who performed the ceremony states that he "did join in the Bonds of Matrimony * * * Theodore J. Simon of New Prague Route # 2 a resident of the County of Rice State of Minnesota."

Depositions of Theodore Simon and James Simon were taken under oath on March 30 and 31, 1959. In these it was stated unequivocally that Theodore lived at his father's home. Characteristic of the testimony of the parties at these depositions and at the original trial is the following:

"Q [To James Simon] And up until the time of the accident, Theodore had been living at home with you?

"A Theodore and his brother and one sister."

"Q In connection with Theodore, is it correct as he stated, that except for the time that he has lived — that he was in the service and up to the time that he got married, that he always lived at home with you and your wife?

"A Yes.

"Q Until he got married and except when he was in service, he always used the same room, the same bedroom, in the house?

"A Yes."

From Theodore's deposition we find the following:

"Q And before you left on this day [of the accident], did you go over to your father's place to get his automobile?

"A See, I lived there all the time at that time, I lived with my parents, and that morning my parents planned that trip, and they were leaving earlier. So I told my mother that they could use my car as it was newer, and they took some friends of theirs along, two other married couples, and then I took his car and I drove over to where I live now to do chores.

* * * * *

"Q Now you say that at that time you were not living where you live now?

"A That's right.

"Q And were you living then in the home of your father?

"A That's right."

The record is replete with similar testimony, all of which indicates that up to the time of the present trial, when it became apparent that the prior statements of the parties would defeat a claim of liability on this policy, all parties considered that Theodore lived at his father's home up until the time of his marriage. At the time of this trial an attempt was made to undo the harm that had been done by the prior testimony by showing that, from the time that Theodore entered into a lease with his father, he was living at the Scott County farm and was not a member of his father's household. The question here is whether there is such conflict in the credible evidence that the court's findings must stand.

The trial court found (1) that the exclusionary clause contained in the policy involved herein is ambiguous and therefore open to construction and, as so construed, does not exclude liability under the facts of this case; (2) that there was no regular use of the automobile within the meaning of the exclusionary clause; (3) that application of the exclusionary clause in this policy of insurance under the facts of this case would be arbitrary and discriminatory; and (4) that Theodore Simon and James Simon were not members of the same household.

In holding that the exclusionary clause was ambiguous, the court relied upon Travelers Ind. Co. v. Pray (6 Cir.) 204 F. (2d) 821. The rationale of the Pray decision, a two-to-one decision, has been almost uniformly rejected by courts dealing with exclusionary clauses identical with or similar to the one before us.[2] It would be useless to review the authorities on this subject since it has been done adequately elsewhere. Many of the cases are found in Leteff v. Maryland Cas. Co. (La. App.) 91 So. (2d) 123, and in Annotation, 173 A. L. R. 901, and supplemental decisions. See, also, Aler v. Travelers Ind. Co. (D. Md.) 92 F. Supp. 620; Lontkowski v. Ignarski, 6 Wis. (2d) 561, 95 N. W. (2d) 230; Lewis v. Bradley, 7 Wis. (2d) 586, 595, 97 N. W. (2d) 408, 413; Giokaris v. Kincaid (Mo.) 331 S. W. (2d) 633.

---

[2]One of the few cases that have followed it is Juzefski v. Western Cas. & Surety Co. 173 Cal. App. (2d) 118, 342 P. (2d) 928, another two-to-one decision of the District Court of Appeals of California. The dissenting opinion in that case, rejecting the Pray case and following Aler v. Travelers Ind. Co. (D. Md.) 92 F. Supp. 620, is the more convincing.

While the court in the Giokaris case held that the insured driver of the automobile causing the injury was not a member of the same household as the owner of the car, it did hold, after quite an exhaustive review of the authorities, that an exclusionary clause such as we have here was unambiguous and would apply if the insured driver of the automobile and the owner were members of the same household. On this issue the Missouri court refused to follow the Pray decision. By far the great weight of authority holds that there is no ambiguity in such clause.

We have recently had occasion to examine and restate the rules applicable to the construction of insurance contracts, and especially those containing exclusionary clauses. Bobich v. Oja, 258 Minn. 287, 104 N. W. (2d) 19. We have frequently held that if a provision in an insurance contract is ambiguous it must be construed against the insurer, who prepared the contract. Tomlyanovich v. Tomlyanovich, 239 Minn. 250, 58 N. W. (2d) 855, 50 A. L. R. (2d) 108. This rule is limited, however, by another rule. Where the insurance contract is unambiguous, the language used must be given its ordinary and usual meaning the same as any other contract, and we have no more right to redraft an insurance contract under the guise of strict construction to reach a result that we would prefer than we have to redraft any other contract. Bobich v. Oja, *supra*. We cannot agree with the trial court that the language used in this exclusionary clause is ambiguous. Giving the words used their ordinary meaning, the "Use of Other Automobiles" clause excludes coverage where an automobile not covered by the insurance is owned by the named insured or a member of the same household, *or* where an automobile is furnished for regular use to either the named insured or a member of the same household.

It is conceded that the automobile involved in the accident here was not furnished to Theodore Simon for regular use, so that provision of the contract becomes unimportant. It is likewise conceded that the automobile driven by Theodore Simon at the time of the accident was owned by James Simon. There remains then for determination only the question whether Theodore Simon was a member of the same household as James Simon. If he was, the exclusionary clause clearly applies.

■ We have heretofore quite exhaustively explored the meaning

of the word "household" as used in these exclusionary clauses. Engebretson v. Austvold, 199 Minn. 399, 271 N. W. 809. Many of the cases are collected in Tomlyanovich v. Tomlyanovich, 239 Minn. 250, 58 N. W. (2d) 855, 50 A. L. R. (2d) 108. See, also, Annotation, 50 A. L. R. (2d) 120.

In Tomlyanovich v. Tomlyanovich, 239 Minn. 250, 255, 58 N. W. (2d) 855, 858, 50 A. L. R. (2d) 108, 113, we quoted with approval the following from Ocean Acc. & Guaranty Co. Ltd. v. Schmidt (6 Cir.) 46 F. (2d) 269, 270:

"In Arthur v. Morgan, 112 U. S. 495, 499, 5 S. Ct. 241, 243, 28 L. Ed. 825, the court said: 'Persons who dwell together as a family constitute a "household." ' * * * *We do not doubt that a son living under the parental roof is a member of the household even though he has reached his majority and supports himself, * * *.*" (Italics supplied.)

■ There is no question but that Theodore Simon intended to and did make the Scott County farm his home as soon as he was married. The question, however, is whether he was a member of his father's household at the time of the accident, which preceded his marriage by 16 days. Much of the testimony, and the arguments of plaintiffs here, are pointed toward establishing a future intention to make the Scott County farm his home. However, intention does not establish present fact, and, regardless of what Theodore's future intention was, the exclusionary clause applies if at the time of the accident he was a member of his father's household. Theodore's future intention is based largely on his testimony at the time of the present trial, of which the following is illustrative:

"Q. But you didn't consider yourself to be living there until you moved in after you were married, did you?

"A. No, that I—I considered myself living there just right after Norbert's death because it was my chores there and I took care of it as my own and I had planned to live there just right after his death.

"Q. You had planned to but you hadn't moved in yet, had you?

"A. Well, I had my clothes there. I had some of my clothes, and I had facilities there and I stayed there."

"Q. All right. You intended to make this dwelling house on the farm where you now live your home?

"A. Yes.

"Mr. Moonan: As of April 1, 1958.

"The Witness: As of April 1.

\* \* \* \* \*

"Q. When did you intend to make it your home, as of what date were you going to regard it as your home?

"A. Well, I first gave it thought right after my brother's death, that I gave it thought right away that that I would, and then on—

\* \* \* \* \*

"A. —April 1, 1958, we made up a contract with my Dad, and ever since then *my intentions were to make it my home with my wife,* and we did—I did so, and I spent, well, I could say eighty per cent of the time over there.

\* \* \* \* \*

"Q. All right. When you entered into some sort of an arrangement with your father around April 1, 1958, you still felt, 'That will eventually be my home,' did you not?

"A. Well, then I already started making it my home.

"Q. All right. Your real thought in your mind was that when you and your wife were actually married that that would be the home of you and your wife and your eventual family, your children?

"A. Well, I thought of it as my home even before that, and then I knew—*I knew that we would live there.*" (Italics supplied.)

Even this evidence falls short of establishing the fact that he was not a member of his father's household up to the time of his marriage. The testimony establishes only that he intended to make the Scott County farm his home when he was married. Obviously, he could not make it his home with his wife before he had a wife. That did not occur until some time after the accident.

In Engebretson v. Austvold, 199 Minn. 399, 271 N. W. 809, the question was whether defendant had her residence at her father's home. The facts are similar to those in this case. There, as here, defendant had been gone and had returned to her parents' home upon the death

of her husband. She claimed, however, that it was her intention to return to Montana, where she had lived during her marriage. We there said (199 Minn. 402, 271 N. W. 810):

"If defendant was a resident of Minnesota, as she so solemnly averred to the probate court, secretary of state, and University of Minnesota, she was necessarily a resident in her parents' home. *No mere oral denial can shake a fact so established and so buttressed as that is by this record.* Defendant's unquestioned and repeatedly asserted residence in Minnesota becomes precisely localized in the family home near Glenwood." (Italics supplied.)

The same is true here. The signed statement of Theodore, his sworn application for the marriage license, the certificate of marriage, the testimony of both Theodore and James in depositions and at the original trial all belie any claim that he was living at the Scott County farm prior to his marriage.

Even the trial court's attempt to elicit testimony to the contrary was unsuccessful. After plaintiff's counsel had attempted to establish that Theodore lived at the Scott County farm, the following transpired in the examination of James Simon:

"The Court: Well, I think the examination is getting slightly out of hand, and in view of that fact I will take over myself.

"Mr. Simon, there has been some interrogation here on the part of both Mr. Moonan and Mr. Johnson in regard to the words 'living' and 'staying,' and when you were interrogated by Mr. Johnson it appears that you said that living was staying there all the time, and that you referred to your son Ted as living at your place all the time with the exception—until after he was married on September 23, 1958, and the record shows that you actually said that, and that he occasionally or on certain nights and days, or nights stayed at the second place which is located some seven miles from the farm, from where you live.

"Now, what are the actual facts, after having told us that you know what 'living' means and what 'staying' means? Where was Ted actually living from April 1, 1958, up until the time of the accident and beyond, September 7, 1958—just a minute—was he living at the second place, which is the place that he was operating on a fifty-fifty basis, on

a partnership basis with you, or was he still living at home where he had been living since the time of a small boy; now where was he living, at the second place or at your place?

"The Witness: *He was living at my place.*

"The Court: *He was living at your place?*

"The Witness: *Yes.*

"The Court: *And that is your testimony?*

"The Witness: *Yes.*

"The Court: And staying, you mean he was staying at the second farm?

"The Witness: Yes.

"The Court: And you know the meaning now of the words 'staying' and 'living,' you understand —

"The Witness: Yes.

"The Court: —the difference, or are you confused?

"The Witness: I don't know.

"The Court: I think you have previously testified that you went through the eighth grade, isn't that right?

"The Witness: Yes.

"The Court: You have been on the stand here now since 1:15. It's approximately 3:10 this afternoon. You have been interrogated by these lawyers, one, two, three, four, five, six lawyers here, two, three, four of them interrogating you during all that period of time. Are you confused now and upset?

"The Witness: Yes.

"The Court: And you don't know, as a matter of fact, what 'staying' means or what 'living' means right now, is that right? I am trying to be helpful here.

"The Witness: I know.

"The Court: I want the right thing. Do you understand? If you don't I want you to tell me.

"The Witness: I don't know. I don't know.

"The Court: You don't understand?

"The Witness: No.

"The Court: You are just answering so that you can get off the

stand, is that it? You turned to me one time and you wanted to say something to me.

"The Witness: I did. I was going to say about that Milwaukee that I had it 20 years ago when he told me that he can take—that I couldn't get no policy, I had insurance with Milwaukee 20 years before they canceled me out. That was what I was going to say.

"The Court: Well, do you want to interrogate further?

"Mr. Bowen: I think we should have a recess, Your Honor.

"The Court: I think, probably, that is indicated. Now you try to calm down, will you, during the recess. Take a recess for a long enough time, 15 minutes.

"(Recess.)

"The Court: Who is next now?

"Mr. Young: Well, I'd like to ask just a question or two that I forgot, if I may.

"The Court: All right." (Italics supplied.)

Undoubtedly Theodore spent most of his working days on the Scott County farm. It is not uncommon, however, for a member of a household to spend his working days away from home. Whether he worked on the farm separated from his home or in an office or factory would make little difference. The question here, again, is not where he worked but where he lived.

It is of course possible that different people may live in the same house, at least temporarily, without becoming members of the same household. Such was the holding of the court in Giokaris v. Kincaid (Mo.) 331 S. W. (2d) 633, and Lumbermen's Mutual Cas. Co. v. Pulsifer (D. Me.) 41 F. Supp. 249.[3] Determination of the question whether individuals living together are members of the same household must rest on the facts of each case. In this case, no one would deny that from the time Theodore returned from the armed services until the death of his brother Norbert he was a member of his father's household. Upon Norbert's death, it is true that Theodore began to look after the Scott County farm, but he continued to live at his father's

---

[3]See, also, 5A Am. Jur., Automobile Insurance, § 108; Annotation, 50 A. L. R. (2d) 121.

home the same as before. During 1957 his father claimed Theodore as his dependent in his income tax return. It could hardly be contended that he was not a member of his father's household at least until the time when he entered into a leasing arrangement with his father for the Scott County farm in the spring of 1958. It would seem that even the plaintiffs in this action concede that to be a fact. After entering into this lease, Theodore continued to live at home exactly as he had done before. It is true that there was a change in his economic status in that he received a share of the income from the Scott County farm, but there was no change as far as his living at home was concerned. If he had simply procured a job away from his home and continued to live there as before, he would be nonetheless a member of the same household even though he had changed his occupation. That is the situation we have here.

Plaintiffs also seek to establish coverage by showing that when Theodore procured the insurance the agent who sold it to him assured him that he "had full coverage on [his] automobile." Even if that testimony could change the terms of the policy as written, it fails to go to the issue involved here. Nowhere in the record does it appear that the agent for the insurer on Theodore's policy gave him any assurance that he had coverage in driving his father's car. But aside from that, the specific terms of the insurance policy may not be varied by such parol evidence. Much as we might dislike exclusionary clauses which may mislead the insured, an insurance policy is still a contract, and where its provisions are unambiguous the courts have no right to thrust upon the insurer a risk that it did not accept and for which it was not paid a premium. The contract rights of the parties must be determined from the language used in the contract where it is unambiguous, not from language the courts would like to read into the policy. It is clear to us that the evidence in this case conclusively establishes that on the date of the accident Theodore Simon was a member of his father's household; that the automobile driven at the time of the accident was owned by his father; and that the policy involved excludes liability under these circumstances.

Plaintiffs point to the fact that in Tomlyanovich v. Tomlyanovich, *supra*, we said that the purpose of the exclusionary clause involved

there was to exempt the insurer in cases where plaintiff and defendant would be apt to favor each other. In that case, plaintiff and defendant were members of the same household. Here, obviously, that reasoning would not apply because the injured parties, plaintiffs in the previous actions, were in no way either related to or a member of the household of the defendants in that action. However, what we said in the Tomlyanovich case applied to the facts of that case and not to the facts of this case, and the reason given there for the exclusionary clause was not intended to rule out other reasons for such clauses. Under facts such as we have here, the obvious purpose is to exclude liability where members of the same household have automobiles used, or potentially available for use, interchangeably. In such case, one of such automobiles could be insured and another uninsured, and the insurance on the one be held to cover the uninsured car without payment of any premium for the assumption of such risk, if it were not for the exclusionary clause. Or, as here, one automobile could be covered by a large amount of insurance and the other by a nominal amount and both receive the benefit of the larger amount of insurance for which only one premium had been paid. See, Leteff v. Maryland Cas. Co. (La. App.) 91 So. (2d) 123; Aler v. Travelers Ind. Co. (D. Md.) 92 F. Supp. 620; Annotation, 173 A. L. R. 901.

The evidence in this case requires a finding that Theodore Simon, on the date of the accident, was a member of his father's household. It follows that the exclusionary clause applies and that there is no liability.

Reversed.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.