INDEPENDENT SCHOOL DISTRICT NO. 197, et al., judgment creditors, Respondents,

and

W.R. Grace & Co.–Conn., judgment debtor, Respondent,

v.

ACCIDENT AND CASUALTY INSURANCE OF WINTERTHUR, et al., Garnishees,

Continental Casualty Company, garnishee, Appellant (C3–94–827),

First State Insurance Company, et al., garnishees, Appellants (C3–94–830),

Plaisted and London Market Companies, et al., garnishees, Appellants (C6–94–854).

Nos. C3–94–827, C3–94–830 and C6–94–854.

Court of Appeals of Minnesota.

Jan. 10, 1995.

Richard A. LaVerdiere, Harvey N. Jones, Michael R. Strom, Sieben Polk LaVerdiere, Jones & Hawn, Hastings, Philip G. Barber, Pitney Hardin, Florham Park, NJ, for Independent School Dist. No. 197.

J. Michael Schwartz, John Childs, Popham, Haik, Schnobrich & Kaufman, Minneapolis, for W.R. Grace & Co.–Conn.

Jerome B. Abrams, Paul R. Smith, Austin & Abrams, Minneapolis, William P. Ford, Cushing O. Condon, Ford, Marrin, Esposito, Witmeyer & Gleser, New York City, for Continental Cas. Co.

William J. Bowman, Kevin P. Gallagher, Donald C. Brown, Jr., Hogan & Hartson, L.L.P., Washington, DC, Kyle B. Mansfield, Thomas M. Stieber, Foley & Mansfield, Minneapolis, for First State Ins. Co.

Frank J. Walz, Caryn Glover, Best & Flanagan, Minneapolis, Thomas J. Quinn, Eileen T. McCabe, Eugene P. Murphy, Mendes & Mount, New York City, for Plaisted and London Market Companies.

Considered and decided by NORTON, P.J., and SHORT and FOLEY [*], JJ.

## OPINION

SHORT, Judge.

This action is a garnishment action brought by five Minnesota school districts ("schools") and W.R. Grace & Co.–Conn. ("Grace"). The schools and Grace seek a declaration that excess insurance policies issued from 1973 through 1984 provide coverage for the underlying asbestos-related building claims and argue the insurers are required to pay an eighteen-million-dollar judgment against Grace. The trial court granted a series of judgments in favor of the schools and Grace. Three groups of insurers [1] appealed those judgments, and we consolidated their appeals. The insurers argue the trial court: (1) abused its discretion in declining to dismiss the action on grounds of forum non conveniens; (2) erred in granting summary judgment because disputed issues of material fact exist with respect to Grace's expectations, possible misrepresentations by Grace, and the reasonableness of Grace's settlement agreement with the schools; and (3) erred in concluding that pollution exclusions do not bar coverage for asbestos-related building claims.

## FACTS

Between 1968 and 1973, the schools installed Monokote-3 spray-applied fireproofing

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. The groups of insurers include: (1) Continental Casualty Company; (2) First State Insurance Company, Hartford Accident & Indemnity Company, AIG Companies, American Re–Insurance Company, Allstate Insurance Company, Transamerica Insurance Company, Federal Insurance Company, and Gerling–Konzern Allgemeine Versicherungs–Aktiengesellschaft; and (3) Plaisted and London Market Companies, Guarantee Insurance Company, and Zurich International, Ltd.

and Hi–Sorb acoustical plaster. Grace produced and sold these building products, both of which contain asbestos.

In 1983, Grace asserted asbestos-related coverage claims against its insurers in two actions in federal court in New York. One action has determined coverage issues under the primary policies. *Maryland Casualty Co. v. W.R. Grace & Co.,* 23 F.3d 617, 624 (2d Cir.1993) (applying the "injury-in-fact" trigger of coverage, under which insurers are obligated on the risk undertaken when asbestos was installed in the buildings involved in the underlying lawsuits against Grace), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 559 (1994). The second action will determine coverage under Grace's excess policies. *Maryland Casualty Co. v. W.R. Grace & Co.-Conn.,* No. 88 Civ. 2613, 1994 WL 592267 (S.D.N.Y. Oct. 26, 1994) (granting excess insurers' motions for summary judgment except as to First State Insurance Company's 1975 policy and dismissing Grace's claim for a declaratory judgment that the excess insurers owe Grace a duty of coverage).

In 1987, Minnesota schools began to assert that release of asbestos fibers from Grace's products contaminated their buildings. The schools sued Grace in Minnesota for compensatory and punitive damages. After extensive discovery, the parties resolved their differences in a settlement executed in 1991. Under the settlement terms, Grace confessed judgment for eighteen million dollars, the schools agreed to pursue judgment solely against Grace's insurers, and Grace promised to advance nine million dollars to the schools and to seek repayment of this sum only if the schools were successful in their claims against Grace's insurers. Grace also provided the schools with its national counsel and paid all attorney fees incurred in pursuing claims against the insurers.

In 1991, the schools and Grace brought this garnishment action in Minnesota against Grace's insurers. The trial court denied the insurers' motion to dismiss on grounds of forum non conveniens. In 1992, the trial court concluded the settlement between the schools and Grace was reasonable as a matter of law and held the policies' pollution exclusions did not bar coverage. The trial court granted partial summary judgment in favor of the schools and Grace. Discovery closed in August 1993, and trial was set for October 1993. On September 13 and 14, 1993, the trial court heard motions for summary judgment. Ten days later, the trial court reopened discovery and postponed trial until November 29, 1993. On October 18, the trial court ordered Grace to produce more than 1,800 boxes of documents. On November 2, before Grace produced the documents, the trial court told the parties it had decided to grant summary judgment in favor of the schools and Grace on all remaining issues. On January 24, 1994, the trial court entered judgment in favor of the schools and Grace.

## ISSUES

I. Did the trial court abuse its discretion in concluding Minnesota was a convenient forum?

II. Do any disputed issues of material fact preclude summary judgment?

III. Do the excess insurance policies' pollution exclusion clauses preclude coverage for losses resulting from asbestos contamination as a matter of law?

## ANALYSIS

### I.

 Minnesota forum non conveniens law establishes a strong presumption in favor of the plaintiff's choice of forum. *Bergquist v. Medtronic, Inc.,* 379 N.W.2d 508, 511 (Minn.1986). To rebut that presumption, a defendant must show that a series of public and private interest factors weigh in favor of an alternative forum. Those factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for the attendance of willing witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) the administrative burdens a lawsuit will impose upon a court; (5) the interest in having localized controversies decided at home; and (6) the court's familiarity with the applicable law. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The trial court is

to exercise broad discretion in deciding whether to dismiss an action on grounds of forum non conveniens, and we will not reverse the trial court's decision unless we find that there has been an abuse of discretion. *Bergquist,* 379 N.W.2d at 511–12; *In re Florance,* 360 N.W.2d 626, 632 (Minn.1985).

■ The insurers argue the trial court abused its discretion by failing to dismiss the action on forum non conveniens grounds in favor of jurisdiction in New York. The record, however, shows that: (1) the schools and Grace commenced this garnishment action in Minnesota; (2) the case involves claims of damage to property located in Minnesota, enforcement of a settlement agreement executed in Minnesota, and interpretation of numerous insurance policies; (3) the underlying action between the schools and Grace was commenced, litigated, and settled in Minnesota; (4) Grace settled the underlying lawsuit pursuant to *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982); and (5) both New York and Minnesota recognize the "actual injury" trigger of coverage. *See Northern States Power Co. v. Fidelity & Casualty Co. of N.Y.,* 517 N.W.2d 918, 922 (Minn.1994) ("only those policies in effect when damage occurred are triggered"); *Continental Casualty Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 971–72, 609 N.E.2d 506, 511–12 (1993) (adopting an "injury-in-fact" trigger of coverage, "which rests on when the injury, sickness, disease, or disability actually began").

Under these facts, we cannot say the trial court abused its discretion in concluding the insurers failed to rebut the presumption in favor of the schools' and Grace's choice of Minnesota as the proper forum for this action.

## II.

Minn.R.Civ.P. 56.03 authorizes summary judgment when no genuine issue exists as to any material fact and where determination of the applicable law will resolve the controversy. *See Wartnick v. Moss & Barnett,* 490 N.W.2d 108, 112 (Minn.1992) (in reviewing summary judgment, court views evidence in light most favorable to nonmoving party to determine whether fact issues exist and

whether trial court erroneously applied law). The moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). All factual inferences and ambiguities are drawn against the moving party. *Rathbun v. W.T. Grant Co.,* 300 Minn. 223, 230, 219 N.W.2d 641, 646 (1974). On a motion for summary judgment, the trial court is not to try issues of fact but is to determine whether there are genuine issues of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Illinois Farmers Ins. Co. v. Tapemark Co.,* 273 N.W.2d 630, 633 (Minn.1978). The nonmoving party may not rest on allegations or demands in its pleadings, but must come forward with specific facts showing a genuine issue of material fact exists for trial. Minn.R.Civ.P. 56.05.

The insurers argue the trial court erred in resolving fact issues relating to Grace's expectations, possible misrepresentations by Grace, and the reasonableness of Grace's settlement agreement with the schools. By contrast, the schools and Grace argue the insurers failed to present evidence that Grace expected the schools' property damage, to cite a single misrepresentation made by Grace, or to rebut the prima facie evidence that their *Miller–Shugart* settlement agreement was reasonable and prudent.

### Grace's Expectations

■ Each of the insurance policies at issue defines "occurrence" in a similar fashion. An "occurrence" requires an accident resulting in property damage that is neither expected nor intended by the insured. *Bituminous Casualty Corp. v. Bartlett,* 307 Minn. 72, 77, 240 N.W.2d 310, 312 (1976). The United States Court of Appeals for the Eighth Circuit has defined the term "expected" as follows:

For purposes of an exclusionary clause in an insurance policy the word "expected" denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions * * * * The results cease to be expected and coverage is present as

the probability that the consequences will follow decreases and becomes less than a substantial probability.

*Auto–Owners Ins. Co. v. Jensen,* 667 F.2d 714, 720 (8th Cir.1981) (quoting *City of Carter Lake v. Aetna Casualty & Sur. Co.,* 604 F.2d 1052, 1058–59 (8th Cir.1979)). This standard for expectability is objective and involves a higher degree of certainty than reasonable foreseeability. *Id.; see Continental W. Ins. Co. v. Toal,* 309 Minn. 169, 176 & 176 n. 3, 244 N.W.2d 121, 125 & 125 n. 3 (1976) ("expected injury" cannot be equated with foreseeable injury because the term "expected" means a "high degree of certainty").

■ With regard to the issue of Grace's expectations, viewing the evidence in the light most favorable to the insurers, the record shows: (1) in 1968, Grace knew of the hazards of asbestos and believed release of asbestos fibers from Monokote–3 spray-applied fireproofing could result in property damage; (2) in 1969, a Grace manager wrote about asbestos's harmful effects and the "possible long-term danger to building occupants" from prolonged exposure to minute asbestos fibers circulating through ventilation systems; (3) as early as 1969, Grace managers believed the company had "an ethical obligation" to remove asbestos; (4) a Grace scientist told his colleagues that Grace "had a potential cracking problem with Monokote since its inception;" and (5) an industrial hygienist stated in an affidavit that persons involved in the industry knew for many years of the hazardous nature of asbestos-containing products. Contrary to the assertions of Grace and the schools, these facts could indicate more than mere "product liability negligence." This evidence creates an issue of material fact as to whether Grace knew or expected property damage would occur. *See Maryland Casualty Co. v. W.R. Grace & Co.,* 794 F.Supp. 1206, 1218 (S.D.N.Y.1991) (summary judgment improper when evidence showed insured was aware of hazards of asbestos products but continued to sell asbestos products until prohibited by law).

## Grace's Misrepresentations

■ The insurers have a defense to coverage if Grace misrepresented any material fact with intent to deceive or defraud the insurers or if a material misrepresentation by Grace increased the insurers' risk of loss. Minn.Stat. § 60A.08, subd. 9 (1992); *see Preferred Risk Mut. Ins. Co. v. Anderson,* 277 Minn. 342, 344, 152 N.W.2d 476, 479 (1967) (insurer may avoid coverage if a material misrepresentation increases the risk of loss, regardless of the insured's intent). Although the insurers have the burden of proving this affirmative defense, the question of whether a material misrepresentation increases an insurer's risk of loss is a question to be decided by the trier of fact. *Craigmile v. Sorenson,* 248 Minn. 286, 295, 80 N.W.2d 45, 51 (1956); *Transamerican Ins. Co. v. Austin Farm Ctr., Inc.,* 354 N.W.2d 503, 506 (Minn.App. 1984), *pet. for rev. denied* (Minn. Feb. 6, 1985).

With regard to the issue of any misrepresentations by Grace, viewing the evidence in the light most favorable to the insurers, the record shows: (1) as early as 1968, Grace knew its products were hazardous; (2) in a 1974 response to a catch-all question at the end of a policy application, Grace responded it knew "of no other relevant facts which might affect underwriters' judgment when considering this application;" (3) two underwriters stated in affidavits that between 1982 and 1985 a Grace representative said "Grace had no real exposure to asbestos-related claims;" and (4) during negotiations of several insurance policies in 1984, Grace characterized its involvement in asbestos-related litigation as "minimal" and "peripheral" and referred to itself as a "minor player" in such litigation. Although the insurers' affirmative defense ultimately may be rejected by the trier of fact, the record evidence creates an issue of material fact as to whether any misrepresentations by Grace increased the insurer's risk of loss.

## Grace's Settlement Agreement

■ When an insurer has denied that its policy affords any coverage for a claim brought against its insured, the insured may agree to have judgment entered against it on condition the judgment is collectible only from available insurance. *Miller v. Shugart,*

316 N.W.2d 729, 734 (Minn.1982). Such a judgment is binding on the insurer if: (1) the judgment was obtained without fraud or collusion; and (2) the settlement on which the judgment is based was reasonable and prudent. *Id.* at 734–35.

 In this case, the trial court concluded that collusion required a showing of fraudulent intent. A settlement, however, is not enforceable if it is the product of fraud *or* collusion. *Id.; see Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589, 592 (Fla.Dist.App.Ct.1984) (a settlement may not be enforced against the carrier if it is unreasonable in amount or tainted by bad faith). Collusion, for purposes of a *Miller–Shugart* settlement, is a lack of opposition between a plaintiff and an insured that otherwise would assure that the settlement is the result of hard bargaining. *See Sargent v. Johnson,* 551 F.2d 221, 232 (8th Cir.1977) (plaintiff and insured entered into "a questionable collaboration by which the parties maneuvered through terms of a settlement agreement to impose an uncompromised full balance of a judgment upon the insurer, while the insured incurred no real detriment"), *quoted in Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865, 874 n. 8 (Minn.1989).

 Whether a *Miller–Shugart* settlement is reasonable and prudent is an issue of fact to be decided by the court as the factfinder. *Alton M. Johnson Co. v. M.A.I. Co.,* 463 N.W.2d 277, 279 (Minn.1990); *Miller,* 316 N.W.2d at 735. In this case, reasonableness depends on whether a reasonably prudent person in Grace's position would pay eighteen million dollars after taking into consideration the merits of the claims against it, the evidence regarding liability and damages, and the risks of proceeding to trial. *See Alton M. Johnson Co.,* 463 N.W.2d at 279 (settlement is reasonable and prudent if a reasonably prudent person in defendant's position would have accepted it after considering facts regarding liability and damages, and the risks of going to trial) (quoting *Miller,* 316 N.W.2d at 736).

 The trial court granted summary judgment in favor of the schools and Grace on the issue of reasonableness, and it reserved judgment on the question of collusion. Reasonableness and collusion, however, are not readily separable issues. Collusion would make a facially reasonable settlement unreasonable in fact. *See Steil,* 448 So.2d at 592 (dynamics of *Miller–Shugart* settlements make settlement amount more suspect than in other consent settlements because a defendant with little to lose may agree to an inflated judgment amount in order to avoid personal liability); *Alton M. Johnson Co.,* 463 N.W.2d at 280 (because *Miller–Shugart* settlements are not arm's-length transactions, an unreasonable settlement will be held unenforceable and the underlying tort claim will be reinstated for trial). With respect to the issues of reasonableness and collusion, viewing the evidence in the light most favorable to the insurers, the record shows: (1) Grace consented to an eighteen-million-dollar settlement when the schools claimed compensatory damages of nine million dollars up to the time of settlement; (2) Grace agreed to pay the costs associated with the garnishment action; (3) the schools hired Grace's national insurance counsel to pursue coverage claims against the insurers; and (4) Grace provided the schools with an interest-free advance of nine million dollars. Although these unusual settlement terms may be simply the result of a difficult bargaining position, the facts suggest a possible collaboration by the schools and Grace to impose a substantial loss on the insurers. Viewing these facts from the insurer's perspective, the settlement terms raise an issue of material fact which prevents summary judgment.

We conclude the trial court erroneously resolved fact issues against the insurers on the issues of Grace's expectations, possible material misrepresentations by Grace, and the reasonableness of the settlement agreement. Therefore, we reverse the trial court's grant of summary judgment in favor of the schools and Grace. Because we conclude the schools and Grace are not entitled to summary judgment, we also reverse the trial court's award of attorney fees. The award lacks both substantive merit and statutory or contractual support. *See Lanoue v. Fireman's Fund Am. Ins. Cos.,* 278 N.W.2d 49, 54 (Minn.1979) (attorney fees allowed only when authorized by statute or provided for in

contract); *Morrison v. Swenson,* 274 Minn. 127, 138, 142 N.W.2d 640, 647 (1966) (recognizing limited exception to general rule when insurer wrongfully refuses to defend its insured).

██ The insurers further argue the trial court abused its discretion by granting judgment before discovery was completed. The record shows: (1) the trial court closed discovery on August 6, 1993, and set trial for October 12, 1993; (2) the trial court heard summary judgment motions on September 13–14, 1993; (3) on September 23 and October 18, 1993, the trial court reopened discovery and ordered depositions and production of over 1,840 boxes of documents "germane" to the issues of Grace's misrepresentations and expectations; (4) the parties proceeded with discovery until November 2, 1993, when the trial court announced its intention to grant summary judgment for the schools and Grace; and (5) the trial court did not explain its abrupt change on the discovery issues. After a careful review of this voluminous record, we are compelled to conclude the trial court acted arbitrarily when it granted judgment before Grace had complied with the court-ordered discovery. While a trial court has authority to reconsider rulings and is in a better position than we are to decide the relevance of discovery requests, the trial court offered no explanation for its grant of judgment in the face of recently ordered document production. Under these circumstances, we remand for further discovery to be conducted pursuant to the trial court's orders of September 23 and October 18, 1993. On remand, the trial court has authority to establish a discovery cut-off date and to otherwise manage its calendar and control this case. *See* Minn.R.Civ.P. 26.02(a) (court may limit and control discovery in certain circumstances); *Erickson v. MacArthur,* 414 N.W.2d 406, 407 (Minn.1987) (trial court has "considerable discretion" in granting or denying discovery requests). Our decision on the discovery issue obviates discussion of the insurers' motion to supplement the appellate record with certain documents stricken from the record below.

### III.

██ The construction of an insurance policy is a question of law, subject to de novo review. *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 887 (Minn.1978). The legal principles governing the interpretation of an insurance policy are straightforward. If a policy is unambiguous, the court must give the language its ordinary and usual meaning and not redraft the contract. *Simon v. Milwaukee Auto Mut. Ins. Co.,* 262 Minn. 378, 385, 115 N.W.2d 40, 45 (1962). If the court concludes the policy language is ambiguous, the ambiguity must be resolved in the insured's favor. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 36 (Minn.1979). The insurers bear the burden of proving that a policy exclusion applies to bar coverage. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.,* 383 N.W.2d 645, 652 (Minn.1986).

██ Most of the insurers have policies[2] that follow form to the pollution exclusion contained in the London Market umbrella excess policies. The policies contain a three-pronged exclusion barring coverage for "seepage, pollution, and contamination" arising out of Grace's (1) "oil and/or gas operations on, over and/or under water," (2) "oil and/or gas operations other than those on, over and/or under water," and (3) "all operations of the assured, other than oil and/or gas operations." It is undisputed that neither the first nor the second clause applies in this case. We are asked to determine whether the third clause in the 1976–84 policies, excluding liability for pollution arising from "all operations of the assured, other than oil and/or gas operations," bars coverage for Grace's manufacture and sale of building products which contained asbestos.

---

**2.** The following policies do not contain a pollution exclusion: First State Policy No. 922099; Northbrook Policy Nos. 63001170, 63001171 and 63001172; CNA Policy Nos. RDX8936833, RDX9156645, RDX9156645; and American Re-Insurance Company policies. CNA Policy No. RDX1784529 contained a pollution exclusion different from the London Market policies' exclusion, but a follow form endorsement deleted all preprinted terms inconsistent with the terms of the London Market policies.

The contract provision at issue is quoted in full below.

> It is further understood and agreed that the following attached clause shall apply in respect of all operations of the Assured, other than oil and/or gas operations.
>
> INDUSTRIES, SEEPAGE, POLLUTION AND CONTAMINATION CLAUSE No. 3
>
> *(Approved by Lloyd's Underwriters' Non–Marine Association)*
>
> This Insurance does not cover any liability for:
>
> (1) Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.
>
> (2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.
>
> (3) Fines, penalties, punitive or exemplary damages.
>
> This Clause shall not extend this Insurance to cover any liability which would not have been covered under this Insurance had this Clause not been attached.
>
> All other terms and conditions of the Policy remain unchanged.

 The law regarding pollution exclusions and asbestos claims is settled. A pollution exclusion, not limited by its terms to atmospheric release, bars coverage for asbestos-related building claims. *Board of Regents of the Univ. of Minn. v. Royal Ins. Co. of Am.,* 517 N.W.2d 888, 893–94 (Minn. 1994). Asbestos fibers are a contaminant or pollutant within the meaning of the pollution exclusion. *Id.* at 892. The "sudden and accidental" exception to the pollution exclusion does not apply to asbestos fibers released gradually over time from building products. *Id.* And the pollution exclusion in those policies applies in both industrial pollution cases and products liability cases. *Id.* at 891.

The insurers argue the pollution exclusion contained in several of the 1976–84 policies bars coverage for the schools' claims. Although the schools and Grace concede the pollution exclusion here applies to building products that contain asbestos, they argue the preamble to the exclusion limits its application to industrial operations. When the policy language clearly identifies an exclusion, however, we will not resort to the policy's definitions section to create an ambiguity. *See Columbia Heights Motors, Inc.,* 275 N.W.2d at 34 (court must not create an ambiguity in order to provide coverage). The policies' exclusion is not reasonably susceptible to more than one interpretation. *See Farmers Home Mut. Ins. Co. v. Lill,* 332 N.W.2d 635, 637 (Minn.1983) (policy language is ambiguous if subject to more than one reasonable interpretation). The three-pronged exclusion bars coverage for contamination arising out of all of Grace's oil or gas operations and all of Grace's other operations. The contract's reiteration of three lengthy pollution exclusions and the use of the word "all" in the third exclusion shows the parties intended the exclusion for damage caused by pollution to apply to the whole of Grace's businesses. *See Funk & Wagnalls New Standard Dictionary of the English Language* 73 (1945) ("all" is the whole collectively considered or the complete totality).

The schools and Grace argue the policies' pollution exclusions do not preclude liability for damage caused by Grace's building products. They contend the policies distinguish between operations liability and liability arising out of finished products sold to third parties. *See Tucker Constr. Co. v. Michigan Mut. Ins. Co.,* 423 So.2d 525, 527 (Fla.Dist. App.Ct.1982) (operations coverage applies to providing services, while premises coverage applies to manufacturing products); *American Trailer Serv. Inc. v. Home Ins. Co.,* 361

N.W.2d 918, 920 (Minn.App.1985) (principal thrust of completed operations exclusion is the insured's provision of a service, while the principal thrust of the "products hazard" exclusion is the insured's manufacture or sale of a product); *Friestad v. Travelers Indem. Co.*, 260 Pa.Super. 178, 393 A.2d 1212, 1213 n. 2 (1978) (same); 7A John A. Appleman, *Insurance Law and Practice* § 4508, at 340 (1979) (premises-operations coverage applies to services and is distinct from products liability coverage). The insurance contracts, however, do not distinguish between "operations" and "products liability" coverage. The definition of "products liability" is relevant only because the aggregate limits apply separately to products liability. *See* Barry R. Ostranger & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 7.02(b)(1) (5th ed. 1994) (many comprehensive general liability policies also limit coverage under the completed operations and/or products hazard provisions by providing for an aggregate limit of liability that applies only to claims falling within the completed operations and products hazards). Because the policies are designed to afford coverage for liability resulting from all of Grace's activities, we decline to restrict the pollution exclusions only to Grace's industrial operations.

■ The doctrine of reasonable expectations likewise does not afford coverage. The record shows: (1) the policies' language is not ambiguous; (2) the applicable provisions are not obscure or technical; and (3) the exclusions are not hidden in the policies. Under these circumstances, Grace can have no reasonable expectation of coverage for asbestos contamination. *See Hubred v. Control Data Corp.*, 442 N.W.2d 308, 311–12 (Minn.1989) (no reasonable expectation of coverage in light of unambiguous exclusion) (citing *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 278 (Minn.1985)); *see generally* Gerald J. Morris, Comment, *Great Expectations for the Reasonable Expectations Doctrine*, 12 Wm. Mitchell L.Rev. 371, 384 (1986) (describing relevant criteria for determining what constitutes the insured's "reasonable expectations").

The trial court erred when it concluded as a matter of law that the policies' pollution exclusions do not bar coverage of asbestos-related building claims. The 1976–84 excess policies contain a pollution exclusion that is broader than the exclusion found to bar coverage in *Board of Regents of the Univ. of Minn.* The coverage limitation for damage from contamination under the 1976–84 excess policies applies to all of Grace's business, including the manufacture and sale of asbestos-related materials. Because Grace's 1973–75 policies do not contain the pollution exclusion found in the 1976–84 policies, the trial court must determine whether the 1973–75 policies afford coverage for the schools' claims. If these policies do provide coverage, the trial court should allow the insurers an opportunity, including reasonable discovery, to demonstrate possible double recovery by Grace.

## CONCLUSION

Because this action was commenced in Minnesota and involves claims of damage to property located in Minnesota and enforcement of a settlement agreement executed in Minnesota, the trial court did not abuse its discretion in declining to dismiss this action on grounds of forum non conveniens. However, because disputed issues of material fact exist with regard to Grace's expectations, possible misrepresentations by Grace, and the reasonableness of Grace's settlement agreement with the schools, the trial court erred in granting summary judgment in favor of the schools and Grace. Accordingly, we reverse the trial court's judgment and award of attorney fees, and we direct the trial court to reopen discovery. Discovery is to be conducted according to the trial court's orders of September 23 and October 18, 1993, unless otherwise provided by supplementary trial court orders following this remand. In addition, because the trial court erred in concluding the pollution exclusions contained in the 1976–84 excess policies do not bar coverage for asbestos-related building claims, we direct the trial court to grant judgment in favor of the insurers providing excess policies containing pollution exclusions from 1976 through 1984.

**Affirmed in part, reversed in part, and remanded.**

NORTON, Judge (concurring in part, dissenting in part).

I respectfully dissent in regard to the pollution exclusion issue. On all other issues, I concur with the majority opinion. The third clause of the pollution exclusion on which the majority relies refers to Grace's operation other than oil and/or gas operations. The London policies do not define operations; however, the policies distinguish between the insured's operations and the insured's goods or products. The policies' definition of "products liability" includes:

> Liability arising out of goods or products manufactured, sold, handled or distributed by the Assured * * * if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured * * * and if such occurrence occurs away from premises owned, rented or controlled by the Assured * * *.

> Liability arising out of operations, if the occurrence occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the Assured.

In determining the coverage afforded by an insurance policy, we must consider the policy as a whole, and give unambiguous language its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn.1986). The commonly understood meaning of the term "operations" does not include products manufactured by the insured. *See Friestad v. Travelers Idem. Co.*, 260 Pa.Super. 178, 393 A.2d 1212, 1213 n. 2 (1978) (premises-operations coverage refers to injuries or losses at insured's business premises and non-owned premises under the insured's control; completed operations coverage supplements losses on non-owned premises after insured relinquishes control; products hazard coverage requires insured's manufacture or sale of product, relinquishment of control over product, and injury caused by product away from insured's business premises).

In addressing this issue, it is appropriate to consider the insurance industry's generally accepted definition of the term "operations." *See Carey Canada, Inc. v. California Union Ins. Co.*, 748 F.Supp. 8, 15–16 (D.D.C.1990) (where exclusion contained oil industry terms of art that pertained to oil and gas operations, court would not apply exclusion to asbestos claim). The standard business owner's property coverage form issued by the Insurance Services Office defines "operations" as "your business activities occurring at the described premises." *See* Susan J. Miller & Philip Lefebvre, 1 *Miller's Standard Insurance Policies Annotated* 507.13 (1991). This definition does not include Grace's products.

A pollution exclusion can bar coverage for the insured's products as well as the insured's operations. *Board of Regents of Univ. of Minn. v. Royal Ins. Co.*, 517 N.W.2d 888, 891 (Minn.1994). The exclusion at issue in this case, however, does not include the insured's products, even though the policies' products liability coverage distinguishes between operations and products. A pollution exclusion that is specifically applicable to Grace's operations should not be extended to exclude coverage for liability arising out of Grace's completed products. *See Green Constr. Co. v. National Union Fire Ins. Co.*, 771 F.Supp. 1000, 1007 (W.D.Mo.1991) (refusing to extend faulty workmanship exclusion to insured's completed operations).

I believe that none of the pollution exclusions in the London policies bars coverage for the claims of the school districts against Grace.