BOARD OF REGENTS OF the UNI-
VERSITY OF MINNESOTA, et
al., Petitioners, Appellants,

v.

ROYAL INSURANCE COMPANY OF
AMERICA, Great American Insurance
Company, North River Insurance Com-
pany, et al., Respondents.

No. C1–93–24, C8–93–36 and C5–93–186.

Supreme Court of Minnesota.

June 17, 1994.

Michael R. Seiben, Harvey N. Jones, Michael R. Storm, Seiben, Polk, LaVerdiere, Jones & Hawn, P.A., Hastings and Edward J. Westbrook, Annetta Riley, J. Anderson Berly III, Ness, Motley, Loadholt, Richardson & Poole, P.A., Charleston, SC, for appellants.

Stephen J. Foley, Foley & Mansfield, Minneapolis, for Great American Ins. Co.

Andrew Horstman, Robins, Kaplan, Miller & Ciresi, Minneapolis, for North River Ins. Co., et al.

Austin D. Ditzler, Minneapolis, for Royal Ins. Co. of America.

Laurence M. McHeffey, North River Ins. Co., Morristown, NJ, for North River Ins. Co.

Michael Berens, Kelley & Berens, PA, Minneapolis and Thomas W. Brunner, Laura A. Foggan, Carol A. Barthel, Washington, DC, for amicus curiae Ins. Environmental Litigation Assoc.

## OPINION

SIMONETT, Justice.

Does the "pollution exclusion" in the defendant carriers' insurance policies exclude coverage for asbestos claims? We conclude in this case that it does not for the primary policies but it does for the excess policies. We reverse in part and affirm in part.

From 1969 to early 1972 the University of Minnesota installed asbestos-containing fireproofing materials, manufactured by Asbestospray Corporation, in some of its buildings. In 1985, the Board of Regents of the University and the State of Minnesota (hereinafter called "the Regents") sued, among others, Asbestospray and its successor in interest, H & A Construction Corporation (formerly Spraycraft), for damages for the cost of removing the asbestos from the buildings. When the liability insurers of Asbestospray and H & A Construction denied coverage, the two insureds entered into an agreement pursuant to *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982), confessing judgment in fa-

vor of the Regents for $1.6 million, and assigning their claims against their insurers to the Regents.

The Regents then commenced this action against defendants Royal Insurance Company, North River Insurance Company, U.S. Fire Insurance Company, and Great American Insurance Company. The trial court granted the Regents' motion for summary judgment, finding the *Miller–Shugart* settlement reasonable and the insurers' policies, both primary and excess, to provide coverage.[1] Royal, North River and U.S. Fire (hereinafter "respondent insurance companies") appealed to the court of appeals on multiple issues.[2] The court of appeals affirmed the trial court except on the pivotal issue of insurance coverage, finding that coverage was excluded by the "pollution exclusion" in the policies. *Board of Regents v. Royal Ins. Co. of America,* 503 N.W.2d 486 (Minn.App.1993). Because it found the pollution clause question dispositive, the court of appeals did not address the other issues presented to it. 503 N.W.2d at 489.

The Regents petitioned for further review of the pollution exclusion issue. This is the only issue before us, as the respondent insurers did not file a notice of review. The exclusion clause in the primary policies reads differently from the exclusion clause in the excess policies. Consequently, we will discuss the primary policy exclusion first, and then the excess policy exclusion.

## I.

Respondents' primary policies are Comprehensive General Liability Policies, affording broad coverage for all sums the insured is legally obligated to pay as damages for personal injury or property damage "caused by an occurrence."[3]

The primary policies contain the standard 1973 Form pollution exclusion, which excludes

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

At first glance, this provision seems clear enough. It would appear that if an insured deposits toxic waste in a contained place and it escapes, such as by seeping into the surrounding soil or underground water, the exclusion applies; thus the policy would afford no coverage for the classic case of a waste disposal site which gradually pollutes the area. On the other hand, it appears that if an explosion sends chemical fumes over a residential area, or an oil truck overturns and spills oil into a marsh, these would be sudden and accidental happenings which come within the exception clause of the pollution exclusion, so that the exclusion would not apply and there would be insurance coverage.

But what happens when, as in this case, an insured's fireproofing material installed in a building releases asbestos fibers? Is the pol-

---

**1.** The trial court found that Royal Insurance Company covered Asbestospray, and then Spraycraft, for five 1–year terms with property damage limits of $100,000. North River Insurance Company covered Spraycraft for one 1–year term with property damage limits of $100,000. And Great American Insurance Company covered Spraycraft for three 1–year terms with $100,000 property damage limits.

U.S. Fire afforded excess coverage for two 1–year terms with aggregate property damage limits of $5 million, and North River afforded excess coverage for three 1–year terms with the same limits.

**2.** Great American appealed only the trial court's holding that it was jointly and severally liable for the entire amount of the settlement judgment. This became a non-issue when the Regents agreed in the court of appeals that liability was limited to the stated policy limits. Great American, therefore, is not a party at this level.

**3.** The primary policies define an "occurrence" as "an accident including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

The trial court ruled that the Regents' claim for property damage was caused by an "occurrence." The court of appeals did not reach that issue, and it is not an issue before us.

lution exclusion germane? If it is, does the "sudden and accidental" exception apply so that the exclusion is inapplicable? And if the exception clause does not apply, is the exclusion itself nevertheless inapplicable because of its language? The parties, of course, differ on each of these questions.

### 1. *The relevancy of the pollution exclusion.*

■ The Regents (standing in the shoes of the insureds) first argue that this is a products liability case, not a pollution case. This is simply a case, they argue, where the insured has sold a defective product which has caused property damage. This argument need not detain us for long.

The exclusion speaks to property damages "arising out of" the discharge or release of pollutants. It does not say "arising out of a defective or unfit or negligently made product." In other words, the exclusion defines itself by characterizing the activity of the pollutant, not the activity of the insured polluter. *See, e.g., Park–Ohio Indus., Inc. v. Home Indem. Co.,* 975 F.2d 1215, 1223 (6th Cir.1992) (applying Ohio law).

■ The Regents also rely, however, on a court of appeals opinion, *Grinnell Mutual Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495 (Minn.App.1988), *pet. for rev. denied* (Minn., Feb. 10, 1989), with a somewhat similar fact situation. There the insured's insulation material, when installed in a home, emitted formaldehyde fumes. The court of appeals found insurance coverage, holding that an insured would not reasonably have expected its comprehensive general liability policy to exclude coverage for "unexpected damage due to installation of building materials in a

home." 432 N.W.2d at 499. The reasonable expectations test of *Atwater Creamery Co. v. Western National Mutual Insurance Co.,* 366 N.W.2d 271 (Minn.1985), however, has no place here, and the contrary ruling of *Grinnell* is overruled. In *Atwater,* we held that "where major exclusions are hidden in the definitions section, the insured should be held only to reasonable knowledge of the literal terms and conditions." 366 N.W.2d at 278.[4] In the comprehensive general liability policy involved in this case, the pollution exclusion is plainly designated as such; consequently, the wording of the exclusion should be construed, if a claim of ambiguity is raised, in accordance with the usual rules of interpretation governing insurance contracts. The reasonable expectation test is not a license to ignore the pollution exclusion in this case nor to rewrite the exclusion solely to conform to a result that the insured might prefer.[5]

### 2. *The "sudden and accidental" exception.*

The pollution exclusion does not apply "if such discharge, dispersal, release or escape is sudden and accidental."

The Regents argue that the gradual release of asbestos fibers into the interior space of its buildings over a period of some 20 years was "sudden," and, therefore, the exception to the pollution exclusion applies. And, indeed, the Regents cite respectable authority for the proposition that "sudden" means "unexpected," and then point out that the release of the asbestos fibers was unexpected. *See, e.g., Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570, 573 (1990); *Morton Int'l, Inc. v.*

---

**4.** *Atwater Creamery* presented a unique situation. Under the policy definition, there was no "burglary" on the insured's premises, even though admittedly a burglary had occurred and even though the policy was a "Merchantile Open Stock Burglary Policy." 366 N.W.2d at 274–75. For there to be a burglary, the policy definition required that there be a burglar who left visible marks of a forcible entry or exit. If, as was the case in *Atwater,* the burglar is skillful enough to leave no marks, there is no "burglary." This "visible marks" qualification, we said in *Atwater,* was really a "hidden" or masked exclusion, impermissibly disguised within the definition sec-

tion of the policy. *Id.* at 276–78. The Iowa Supreme Court, it is interesting to note, has limited the application of its reasonable expectations doctrine to egregious situations similar to that in *Atwater. See AID (Mut.) Ins. v. Steffen,* 423 N.W.2d 189, 192 (Iowa 1988).

**5.** The trial court in this case found respondents' pollution exclusions, in both the primary and excess policies, inapplicable by adopting *Grinnell's* reasonable expectation approach. Consequently, the trial court never decided the further issues discussed here and by the court of appeals.

*General Accident Ins. Co. of America,* 629 A.2d 831, 870 (N.J.1993). Other equally respectable authority holds that "sudden" has a temporal connotation, and means something that happens abruptly. *See, e.g., Lumbermens Mut. Casualty Co. v. Belleville Indus.,* 407 Mass. 675, 555 N.E.2d 568, 572 (1990). We note, also, that two panels of our court of appeals have differed on the issue. *Compare Grinnell,* 432 N.W.2d at 499 (construing "sudden" to mean "unexpected" or "unintended") *with Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.,* 480 N.W.2d 368, 375–76 (Minn.App.) ("sudden" means "abrupt"), *pet. for rev. denied* (Minn., Mar. 26, 1992).

Because a word has more than one meaning does not mean it is ambiguous. The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise. Here "sudden and accidental" modifies "discharge, [etc.]." It refers not to the placement of waste in a particular place but to the discharge or escape of the waste from that place. The word "sudden" is used in tandem with the word "accidental," and "accidental" in liability insurance parlance means unexpected or unintended, *Bituminous Casualty Corp. v. Bartlett,* 307 Minn. 72, 76–77, 240 N.W.2d 310, 312–13 (1976), *overruled in part on other grounds, Prahm v. Rupp Constr. Co.,* 277 N.W.2d 389, 391 (Minn.1979); thus to construe "sudden" to mean "unexpected" is to create a redundancy. It seems incongruous, too, to think of a leakage or seepage that occurs over many years as happening suddenly.

We have no difficulty concluding, in the context here used, that the term "sudden" is used to indicate the opposite of gradual. Consequently, we hold that the "sudden and accidental" exception to the pollution exclusion does not apply to asbestos fibers released gradually over time from the insured's product.

**3.** *"Other irritants, contaminants or pollutants."*

Moving to the text of the pollution exclusion itself, the Regents first argue that the smoke, toxic chemicals, and the other waste materials described in the pollution exclusion are the by-product of industrial pollution. Asbestos fibers, they point out, are a naturally occurring mineral, not a waste material, and hence are not contemplated by the pollution exclusion. But the exclusion goes on to include "other irritants, contaminants, or pollutants." We would be doing a disservice to the English language if we were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, were not an irritant.

**4.** *"Into or upon land, the atmosphere, or any watercourse or body of water."*

The Regents further argue that asbestos fibers are not released into the "atmosphere" but only into the air inside the buildings, and therefore the pollution exclusion does not apply. The court of appeals disagreed, stating that to distinguish between air inside and outside a building is an arbitrary distinction.

"Atmosphere" (in its ordinarily understood physical sense) is another name for "air," but—and this is what is important—it is air thought of as being in a particular place. We would not say that the atmosphere in a room is stuffy, but rather that the air is stuffy. We think of atmosphere as the air surrounding our planet, as when Hamlet spoke of "this most excellent canopy, the air." (Act II, scene ii.) So it is that we speak of releasing a balloon into the atmosphere but letting the air out of a tire. Our problem here is how the term "atmosphere" should be understood when used in a pollution exclusion.

This much is clear. The pollution exclusion is directed—at least it was initially—at claims involving the pollution of the natural environment.[6] Thus the exclusion is worded

---

**6.** Concerns about the pollution of the natural environment became prominent in the 1960s with the happening of major oil spills. This led to a growing awareness that our natural resources were being endangered by hazardous wastes that had been allowed to accumulate haphazardly, often over a period of many years. See E. Joshua Rosenkranz, Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo.L.J. 1237 (1986), for a good account of the

broadly to encompass the natural resources of this planet in their natural setting, namely, land, the atmosphere, and bodies of water. It is less clear, however, whether the exclusion was meant to include contamination of these resources outside their natural setting.

Significantly, the pollution exclusion does not use the generic term "water" but rather the phrase "any watercourse or body of water," a description indicative of water in streams, ponds or lakes. The use of the term "land," instead of "property," whether real or personal, likewise appears directed at land as a natural resource. And, within this context, the term "atmosphere," we think, refers to the ambient air.

We are not saying here that air inside a building differs from the air outside, or that the inside and outside air do not intermingle. Rather, within the context of the pollution exclusion, the distinction is not in the air itself but where the air happens to be. When the air supply within a building becomes contaminated, it is harmful to the controlled environment of that building; but the contamination of the air in a building is not harmful to the surrounding natural environment, at least not until it escapes into that environment so as to cause personal injury or property damage—a claim not made here. We conclude, therefore, that the term "atmosphere" in the pollution exclusion does not exclude coverage under the primary policies for the contamination or pollution of air within a building.

At one level, the distinction we make may seem to draw a fine line. But words are deliberately chosen in insurance policies to make distinctions, and we think the construction we have given the word "atmosphere" here is contextually sound and functionally pertinent. Some other courts have arrived at the same conclusion. Thus the Illinois Supreme Court in *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 287, 578 N.E.2d

926, 933 (Ill.1991), concluded that when the word "atmosphere" is read as part of the whole clause (*i.e.*, "into or upon land, the atmosphere, or any water course or body of water"), "it is readily apparent that the pollution exclusion applies to property damage arising from the discharge of pollution into the external environment, or onto some part thereof, rather than the release of asbestos fibers within a building."

## II.

We turn now to the excess policies. Respondent U.S. Fire's excess policies contain the following exclusion:

This policy shall not apply * * * to liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by an occurrence.

Respondent North River's excess policy has a similarly worded exclusion.[7]

■ Here coverage is excluded for the contamination or pollution of "land, water, air or real or personal property." This language differs from that used in the primary policies' exclusion. No attempt is made in the excess policies' exclusion to identify particular pollutants or contaminants. No reference is made to the dispersal or release of a substance from a contained place. But, most importantly, in defining what is being polluted, the exclusion does not use language descriptive of the natural environment only. Not only land but the pollution of real and personal property is mentioned. Instead of "watercourse or body of water," there is simply a reference to water. And instead of atmosphere, the exclusion uses the generic term "air."

We conclude, therefore, that unlike the primary policies, the policy exclusion in the excess policies includes—and therefore excludes from policy coverage—the contamina-

litigation that ensued as polluters sought to transfer the massive costs of clean-up and remedial action to their insurers, and the insurers, through exclusionary provisions, sought to define and limit their policy exposures.

7. North River's exclusion reads:

It is agreed this policy shall not apply to liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by an occurrence.

tion or pollution by asbestos fibers of air within a building.

█ There remains, however, one further issue. The Regents argue that, in any event, the exclusion does not apply to their claim because the release of asbestos fibers from the fireproofing material is not an "occurrence," as that term is used in the pollution exclusion. To understand this argument, we need to consider the interplay between what the excess policy covers and what it excludes.

The policies provide coverage for losses "caused by an occurrence." An "occurrence" is defined as "either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period."[8]

The same phrase, "caused by an occurrence," appears in the pollution exclusion. But here "occurrence" is defined as "a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period." Significantly, the word "accident" is omitted. The deletion of the word "accident" from the definition of "occurrence" in the pollution exclusion makes clear that pollution damage caused by an "accident" is to remain covered under the occurrence-based coverage but that pollution damage caused by continuous or repeated exposure is not to be covered.

In other words, for purposes of the pollution exclusion, the insurer has distinguished between an occurrence by accident and an occurrence by gradual exposure, thus indicating restoration of the term "accident" to its meaning as a single, fortuitous event.[9] We do not understand the Regents to disagree that this distinction has been made. Rather, they argue the exclusion is still inapplicable.

The Regents claim the installation of the fireproofing material was not "continuous or repeated" because it took place on a single occasion, and as to the release of the asbestos fibers, the release was accidental. We think this is a tortuous mischaracterization of what happened. We are not dealing with the dumping or storing of hazardous wastes at a disposal site and the subsequent discharge or escape of the wastes into the surrounding area. Here we have the manufacture of fireproofing material containing asbestos, the installation of the manufactured product in a building, and the subsequent release of the asbestos fibers. The common sense view, we think, is that the "occurrence" causing the pollution damage is the continuous or repeated exposure of the building's interior to the gradual release of the asbestos fibers. Indeed, the Regents' complaint alleges the fireproofing material "continuously admitted [sic] asbestos fibers into the building" and that the "property damage has been and is continuous." Plaintiff's Complaint, Count XII. This continuous or repeated exposure is precisely what the pollution exclusion excludes from coverage.

We hold, therefore, that the pollution exclusion of the excess policies precludes coverage under the excess policies for the Regents' claims.

Reversed in part and affirmed in part.

PAGE, J., took no part in the consideration or decision of this case.

GARDEBRING, Justice (dissenting).

We are asked in this case to decide whether the pollution exclusions in the carriers' insurance policies exclude coverage for claims based on release of asbestos inside buildings. The majority concludes that the asbestos claims are excluded under the excess policies but included under the primary policies. The critical distinction between the

---

8. See footnote 3 to compare the definition of "occurrence" in the coverage provision of the primary policies.

9. Prior to 1966, the comprehensive general liability policy covered losses "caused by accident." Because of litigation over what this phrase meant, in 1966 the insurance industry switched

to coverage for losses "caused by an occurrence." The purpose of this new insuring clause was to clarify that "an accident" could be either a single event fixed in time or a continuous happening. Kenneth S. Abraham, *Environmental Liability Insurance Law* 92–93 (1991); Rosenkranz, *supra* note 6, at 1241–42.

two policies is said to be the use of the term "atmosphere" in the primary policies, as contrasted to the word "air" in the excess policies' pollution exclusions. The majority agrees with the Regents' assertion that asbestos fibers were not released into the "atmosphere," but only into the air inside the buildings, and therefore concludes that the pollution exclusion of the primary policies does not apply.

The majority's rationale is that while the pollution of the air inside a building is harmful to the controlled environment of that building, "the contamination of the air in a building is not harmful to the surrounding natural environment, at least not until it escapes into that environment so as to cause personal injury or property damage—a claim not made here." However, nothing in case law or the language of the policy requires that the pollution exclusion be limited to air outside a building.

While dictionary definitions are not always helpful in making a legal determination, they may be at least as useful as Shakespearean quotations. In this case, one might look, for example, to Webster's Third New International Dictionary 138 (1971), where one definition of atmosphere is "the air of a given place or locality esp. [sic] as affected by a particular characteristic * * *." An example given is "the close atmosphere of the schoolroom," indicating rather plainly that, at least according to Webster, "atmosphere" may mean indoor, as well as outdoor air. Further, beyond the meaning contained within the dictionary, there is nothing in the common sense understanding of the word atmosphere which in any sense limits it to outdoor air.

I agree with the court of appeals that to distinguish between the air inside and the air outside a building is an arbitrary distinction. The majority admits the distinction "may seem to draw a fine line." It is indeed a fine line, one through which air passes freely. The majority would have us believe that air somehow changes its properties as it moves into or out of a building or that the air within the building is completely separate from the air outside the building. This is not the case. Buildings are not completely contained, not

"hermetically sealed." As the court of appeals noted, "[b]uildings have doors, windows, vents, and are not vacuum sealed (particularly a state university with thousands of students and university personnel going in and out of the buildings daily)."

Because I can find nothing in the word "atmosphere" which limits its meaning to outdoor air, I respectfully dissent.

TOMLJANOVICH, Justice (dissenting).

I concur with the dissent of Justice Gardebring.