Aaron R. CARLSON, et al., Appellants,

v.

ALLSTATE INSURANCE COMPANY, Respondent,

Midwest Family Mutual Insurance Company, Respondent,

and

Allstate Insurance Company, defendant and third-party plaintiff, Respondent

v.

Michael J. Fay, et al., third-party defendants, Respondents.

No. A06–1664.

Supreme Court of Minnesota.

May 22, 2008.

David A. Arndt, Hibbing, MN, for Appellant.

Karen Kathleen Hatfield, Hansen Dordell Bradt et al., St. Paul, MN, Rolf E. Sonnesyn, Tomsche, Sonnesyn & Tomsche, P.A., Louise Annette Behrendt, Stich Angell Kreidler & Dodge P.A., Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Aaron Carlson was struck and injured by an uninsured motorist while crossing Lyndale Avenue on foot. Aaron secured a default judgment against the uninsured driver and then sought uninsured motorist coverage under a policy purchased by his father, appellant Robert Carlson, and issued by respondent Allstate Insurance Company. Allstate denied coverage, and the Carlsons brought an action seeking no-fault and uninsured motorist benefits. The district court granted summary judgment in favor of Allstate. On appeal, the Carlsons argued (1) that the policy on its face provides coverage for the accident; (2) that Minn.Stat. § 65B.49, subd. 3a(5) (2006), precludes the policy definition of "insured" and therefore entitles the Carlsons to coverage; and (3) that regardless of the policy's technical terms the Carlsons are entitled to coverage under the doctrine of reasonable expectations. The court of appeals affirmed the district court's grant of summary judgment to Allstate, and we granted review. We affirm.

The facts in this case are largely undisputed. Aaron was the primary driver of a 2002 Ford Focus leased in Robert's name. Robert made all the lease payments on the vehicle and obtained and paid for the insurance. Aaron paid for some of the oil change, gas, and maintenance expenses on the vehicle.

On January 1, 2003, Aaron, then 27 years old, parked the Focus on Lyndale Avenue, left the vehicle, and began to cross the street. Around the center line, he was struck by a vehicle driven by an uninsured motorist making a U-turn. Aaron sustained several injuries, the most serious of which was to his right knee and required surgery. Aaron's injuries forced him to miss work over the ensuing months, resulting in a claimed $10,640 in lost wages. Aaron eventually obtained a default judgment against the uninsured driver in the amount of $170,000.

Robert's insurance policy with Allstate listed Robert and his wife Gail Carlson as named insureds. The policy listed Robert, Gail, Aaron, and Aaron's brother Christopher as drivers. The policy insured several vehicles but listed Aaron as the driver of the Focus 100% of the time.

The policy provided uninsured motorist insurance as follows: "[Allstate] will pay damages for bodily injury * * * which *an insured person* is legally entitled to recover from the owner or operator of an uninsured auto." (Emphasis added.) The policy defined "insured persons" to include in relevant part "[y]ou and any resident" and "[a]ny person while in, on, getting into or out of an insured auto with your permission." [1] (Emphasis omitted.) "You" was defined in turn as "the policyholder named on the Policy Declarations and that policy-

---

1. The Carlsons do not contend that Aaron was a resident. They also do not contend that Aaron was in, on, or getting into or out of the Focus at the time of the injury. Thus, their argument that the policy by its terms covers Aaron turns solely on the contention that Aaron fell within the definition of "You."

holder's spouse who resides in the same household." The term "policyholder" appeared nowhere on the declarations page, which instead identified "named insureds" and "drivers."

Robert acquired the policy through his long-time insurance agent of many years Michael Fay. Robert fully disclosed to Fay that Aaron would be the primary driver of the Focus, that Aaron lived in Minneapolis while his parents lived in Hibbing, and that Robert would be making lease and premium payments. Robert and Fay never discussed, before the accident, the possibility that Aaron could be injured as a pedestrian by an uninsured motorist. Fay acknowledged that he was unaware before the accident that, under these facts, Aaron would not be covered, because Fay had never previously encountered these circumstances. Fay did caution Robert about the potential liability issues that could arise from having his sons on his policy, but Allstate's underwriting policies prohibited listing Aaron as a named insured unless he had an ownership interest in the vehicle. Robert received a multi-car discount as a result of insuring multiple vehicles under the same policy. Although Robert and Fay discussed the differing implications of issuing Aaron his own policy rather than listing Aaron as a driver under Robert's policy, those discussions centered around Robert's potential liability to an injured third party rather than the circumstances under which Aaron would be covered.

Allstate maintains that the facts are undisputed. The Carlsons, however, identify one area of factual dispute. In his deposition, Robert testified that before the accident, he asked Fay if they were insured "the same as I and my wife" and that Fay responded in the affirmative. Fay disputes that Robert asked that precise question, explaining as follows: "Was the question ever asked, are we covered, are the cars covered? Of course, and we say yes, but not to that detail." Because we are reviewing the grant of summary judgment in favor of Allstate, we credit the Carlsons' account for purposes of this appeal. *See, e.g., Yang v. Voyagaire Houseboats, Inc.,* 701 N.W.2d 783, 788 (Minn.2005) (on review of grant of summary judgment, viewing facts in the light most favorable to the party against whom summary judgment was granted).

After the accident, Robert called Fay, who submitted the claim to Allstate, but Allstate declined to provide uninsured motorist coverage. In response, the Carlsons brought an action against Allstate seeking no-fault and uninsured motorist benefits in excess of $50,000.[2] In early 2006, Allstate and later the Carlsons filed motions for summary judgment. The district court granted Allstate's motion and denied the Carlsons' motion as to Allstate, finding that neither the policy language, nor the doctrine of reasonable expectations, nor Minn.Stat. § 65B.49, subd. 3a(5) (2006), provided coverage for Aaron's injuries. The court of appeals affirmed. *Carlson v. Allstate Ins. Co.,* 734 N.W.2d 695, 703 (Minn.App.2007). We granted review.

I.

"On review of a grant of summary judgment, we inquire (1) whether

---

2. The complaint listed Midwest Family Mutual Insurance Company as a codefendant, pleading that in the event Allstate was found not to provide coverage, Midwest would owe the Carlsons no-fault benefits pursuant to the Minnesota Automobile Assigned Claims Plan. The district court granted summary judgment in favor of the Carlsons as to Midwest, and that issue is not before us. In addition, Allstate filed a third-party complaint against Fay individually and Mike Fay Insurance Agency; those claims were dismissed when Allstate obtained summary judgment against the Carlsons.

there exists a genuine issue of material fact; and (2) whether the district court erred in its application of the law." *Bjerke v. Johnson,* 742 N.W.2d 660, 664 (Minn. 2007). "In reviewing the record for the existence of a genuine issue of material fact, we view the evidence 'in the light most favorable to the party against whom summary judgment was granted.'" *Id.* (quoting *O'Malley v. Ulland Bros.,* 549 N.W.2d 889, 892 (Minn.1996)). We review the district court's conclusions of law de novo. *Id.*

■ We turn first to the question of what coverage the policy by its terms affords the Carlsons. The policy provides uninsured motorist coverage to "an insured person" for damages that such person is legally entitled to recover from an uninsured motorist. "Insured person" is defined to include "You," and "You" in turn is defined as "the policyholder named on the Policy Declarations." The Carlsons rely on the fact that the declarations page nowhere uses the term "policyholder" but rather identifies "named insureds" and "drivers." The Carlsons argue that a reasonable person in the Carlsons' position would conclude that "policyholder" included the drivers listed on the declarations page. Allstate responds that a reasonable person in the Carlsons' position would understand that "policyholder" referred to the "named insureds" rather than to the "drivers."

■ "General principles of contract interpretation apply to insurance policies." *Lobeck v. State Farm Mut. Auto. Ins. Co.,* 582 N.W.2d 246, 249 (Minn.1998). When a policy's language is clear and unambiguous, we interpret the policy "according to plain, ordinary sense so as to effectuate the intention of the parties." *Canadian Universal Ins. Co. v. Fire Watch, Inc.,* 258 N.W.2d 570, 572 (Minn.1977). Whether a contract is ambiguous is a question of law

that we review de novo. *Bank Midwest, Minn., Iowa, N.A. v. Lipetzky,* 674 N.W.2d 176, 179 (Minn.2004). Language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations. *Medica, Inc. v. Atl. Mut. Ins. Co.,* 566 N.W.2d 74, 77 (Minn.1997).

The parties advance two different interpretations of the phrase "policyholder named on the Policy Declarations": Allstate argues that the phrase refers only to the named insureds, whereas the Carlsons argue that the phrase encompasses both the named insureds and the drivers. We must decide whether both of these interpretations are reasonable.

The Allstate interpretation comports with standard definitions of the term "policyholder." *Black's Law Dictionary* defines "policyholder" as "[o]ne who owns an insurance policy." *Black's Law Dictionary* 1196 (8th ed.2004). A reasonable person would know who owned the policy, especially where, as here, the policy owner actually secured the policy and paid the premiums. Similarly, *The Random House Dictionary of the English Language* defines "policyholder" as "the individual * * * in whose name an insurance policy is written; an insured." *The Random House Dictionary of the English Language* 1497 (2d ed.1987). The use in this definition of both the word "name" and the word "insured" suggests a connection in the mind of a reasonable person between the terms "policyholder" and "named insured." We thus conclude that a reasonable interpretation of the policy is that the term "policyholder" refers to the named insureds and not the drivers listed on the declarations page.

The Carlsons' interpretation, on the other hand, does not appear reasonable. Other than the fact that the drivers as well as the named insureds appear on the declarations page, the Carlsons offer no basis for

the conclusion that a reasonable person would read "policyholders" to include "drivers." We conclude that a reasonable person, even one unversed in the law or insurance, would understand that "policyholder" referred to the policy's owner.

Because the Carlsons' reading is not reasonable, we hold that the policy is unambiguous and that the term "policyholder" refers to the named insureds on the declarations page. Therefore, Aaron is not a policyholder, not "You," not "an insured," and in turn not entitled to uninsured motorist benefits under the plain language of the insurance policy.

## II.

■ The Carlsons also argue that Minn. Stat. § 65B.49, subd. 3a(5) (2006), precludes the Allstate policy's narrow definition of "insured." The statute provides in relevant part, "If at the time of the accident the injured person is not occupying a motor vehicle or motorcycle, the injured person is entitled to select any one limit of liability for any one vehicle afforded by a policy under which the injured person *is insured.*" *Id.* (emphasis added). The Carlsons argue that Aaron "is insured" under the Allstate policy and that therefore the Minnesota No–Fault Automobile Insurance Act, Minn.Stat. §§ 65B.41–.71 (2006), compels coverage in this situation.

■ In deciding whether a No–Fault Act provision supersedes a contrary policy provision, we attempt to determine what the legislature intended by the relevant statute. See Minn.Stat. § 645.16 (2006) ("The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature."); *see also Kwong v. Depositors Ins. Co.,* 627 N.W.2d 52, 55 (Minn.2001) ("[P]olicy terms that conflict with the No–Fault Act will be held invalid."). Here, the question is whether the legislature intended Minn. Stat. § 65B.49, subd. 3a(5), to impose a definition of "insured" that determines who is covered by uninsured or underinsured motorist coverage mandated by the No–Fault Act, or whether, alternatively, the legislature intended only to set priorities among multiple possible sources for recovery of uninsured or underinsured motorist benefits. We conclude based on the overall structure and language of subdivision 3a(5) that the statute is intended as a list of priorities, rather than as a basic definition of the scope of mandated coverage. That is, the subdivision describes, for each of several categories of circumstances, which policy an injured person may look to for coverage, rather than describing what coverage each of those policies must provide. Under this reading, the meaning of "insured" for purposes of an injured pedestrian depends upon the policy rather than the statute.

Our reading of subdivision 3a(5) is consistent with our description of the purpose of this provision in *Becker v. State Farm Mutual Automobile Insurance Co.,* 611 N.W.2d 7 (Minn.2000).[3] In *Becker,* we ex-

---

**3.** The part of subdivision 3a(5) at issue in *Becker* is as follows:

> If at the time of the accident the injured person is occupying a motor vehicle, the limit of liability for uninsured and underinsured motorist coverages available to the injured person is the limit specified for that motor vehicle. However, if the injured person is occupying a motor vehicle of which the injured person is not *an insured,* the

injured person may be entitled to excess insurance protection afforded by a policy in which the injured party is *otherwise insured.* The excess insurance protection is limited to the extent of covered damages sustained, and further is available only to the extent by which the limit of liability for like coverage applicable to any one motor vehicle listed on the automobile insurance policy of which the injured person is *an insured* ex-

plained that Minn.Stat. § 65B.49, subd. 3a(1)-(2), allows individuals to protect themselves and family members by paying for uninsured and underinsured motorist coverage to which they can turn if injured while riding in a car with lower coverage limits. *Becker*, 611 N.W.2d at 10. Our interpretation comports with the goal of the 1985 amendments to subdivision 3a as expressed in *Becker*: to give owners the ability to select and purchase the amount of coverage they desire in excess of the mandatory minimum and then to access that coverage if they are injured in a vehicle owned by someone with minimum coverage. *Id.* at 13. The concept that subdivision 3a(5) addresses situations where a vehicle owner chooses to purchase more than minimum protection suggests that subdivision 3a(5) is not intended to define mandatory minimum coverage.[4]

Applying this reading of subdivision 3a to the facts before us, the question becomes whether Robert chose to pay for uninsured motorist coverage for someone not a named insured or resident in the event of injury incurred while not occupying a vehicle. To answer that question—that is, to determine the scope of uninsured motorist coverage Robert chose—we look to the policy rather than to the statute. We conclude that because, as discussed above, the policy by its terms affords Aaron no coverage in these circum-

stances, neither does Minn.Stat. § 65B.49, subd. 3a(5).

### III.

◼ Finally, the Carlsons argue that even if the insurance policy by its unambiguous terms does not afford uninsured motorist coverage to Aaron, Aaron should receive coverage under the doctrine of reasonable expectations. We discussed the doctrine of reasonable expectations in *Atwater Creamery Co. v. Western National Mutual Insurance Co.*, in which we construed a policy insuring against burglary. 366 N.W.2d 271 (Minn.1985). The policy at issue defined burglary so as to require "evidence of forcible entry." *Id.* at 274. While concluding that this definition was not ambiguous, we nevertheless did not permit the insurer to enforce a definition that excluded coverage. *Id.* at 276, 278–79. We based this decision on our conclusion that "no one purchasing something called burglary insurance would expect coverage to exclude skilled burglaries that leave no visible marks of forcible entry or exit." *Id.* at 276. We went on to state:

> The doctrine of protecting the reasonable expectations of the insured is closely related to the doctrine of contracts of adhesion. Where there is unequal bargaining power between the parties * * *, the contract will be strictly construed against the party who drafted it.

---

ceeds the limit of liability of the coverage available to the injured person from the occupied motor vehicle.

Minn.Stat. § 65B.49, subd. 3a(5) (emphasis added).

4. Our conclusion that subdivision 3a(5) constitutes a system of priorities and as such governs the source, not the scope, of coverage, finds support from commentators. *See* Theodore J. Smetak, *Underinsured Motorist Coverage in Minnesota: Old Precedents in a New Era*, 24 Wm. Mitchell L.Rev. 857, 933 (1998) (observing that subdivision 3a(5) "established a two-tier *priority* system that gov-

erns access to, and order of payment for, UM and UIM coverages" and "provided a formula-like approach to determining the *source* of UM/UIM coverage") (emphasis added); *see also* Michael Fargione et al., *"Closeness to the Risk" in Uninsured and Underinsured Motorist Coverages in Minnesota*, 24 Wm. Mitchell L.Rev. 945, 948 (1998) ("[Subdivision 3a(5)] created a new system of priorities to determine which underinsured (or uninsured) motorist policies would apply to an individual's underinsured and uninsured motorist claims.").

* * * The result of the lack of insurance expertise on the part of insureds and the recognized marketing techniques of insurance companies is that "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."

*Id.* at 277 (quoting Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions,* 83 Harv. L.Rev. 961, 967 (1970)). Although we noted that courts traditionally required ambiguity in a policy before they would apply the doctrine of reasonable expectations, we rejected ambiguity as a rigid requirement:

> [A]mbiguity in the language of the contract is not irrelevant under this standard but becomes a factor in determining the reasonable expectations of the insured, along with such factors as whether the insured was told of important, but obscure, conditions or exclusions and whether the particular provision in the contract at issue is an item known by the public generally.

*Id.* at 277–78. We cautioned that the doctrine of reasonable expectations does not excuse an insured from reading the policy. *Id.* at 278. We summarized the doctrine as imposing burdens on both insurer and insured: the insurer must communicate coverage and exclusions accurately and clearly, and the insured's expectations must be reasonable under the circumstances. *Id.*

More recent cases have refined the scope of the doctrine of reasonable expectations. In *Hubred v. Control Data Corp.,* we construed a provision in an insurance policy excluding medical expenses due to injury "incurred during employment for wages or profit." 442 N.W.2d 308, 310 (Minn.1989). An insured, who was president and majority owner of a business, was injured at his place of business. *Id.* at 309–10. We rejected the insured's argument that the doctrine of reasonable expectations should apply, reasoning that he had not shown any facts or circumstances justifying a reasonable expectation of coverage. *Id.* at 311–12. We were unpersuaded by the fact that the insurer had not orally informed the insured about the exclusion. *Id.* Although acknowledging that ambiguity is not a prerequisite for applying the doctrine, we emphasized the fact that the exclusion at issue was unambiguous. *Id.*

Later, in assessing whether a "pollution exclusion" in an insurance policy excluded coverage for asbestos claims, we further limited *Atwater. Bd. of Regents of the Univ. of Minn. v. Royal Ins. Co. of Am.,* 517 N.W.2d 888, 889 (Minn.1994). In declining to apply the doctrine of reasonable expectations, we noted that *Atwater* "presented a unique situation," suggesting that the doctrine was not broadly applicable, and also noted that the Iowa Supreme Court had limited its application of the doctrine to "egregious situations similar to that in *Atwater.*" *Bd. of Regents,* 517 N.W.2d at 891 & n. 4. We reasoned:

> The reasonable expectations test of *Atwater* * * * has no place here * * *. In *Atwater,* we held that "where major exclusions are hidden in the definitions section, the insured should be held only to reasonable knowledge of the literal terms and conditions." 366 N.W.2d at 278. In the comprehensive general liability policy involved in this case, the pollution exclusion is plainly designated as such; consequently, the wording of the exclusion should be construed, if a claim of ambiguity is raised, in accordance with the usual rules of interpretation governing insurance contracts. The reasonable expectation test is not a li-

cense to ignore the pollution exclusion in this case nor to rewrite the exclusion solely to conform to a result that the insured might prefer.

*Id.* at 891 (footnote omitted). *Board of Regents* limits *Atwater*, if not to its specific facts, at least to circumstances where the exclusion from coverage was unreasonably hidden. *See Kabanuk Diversified Invs., Inc. v. Credit Gen. Ins. Co.*, 553 N.W.2d 65, 72 (Minn.App.1996) ("[S]ince the Supreme Court's decision in *Atwater*, the doctrine of reasonable expectations has been limited to cases involving contracts with hidden exclusions."), *rev. denied* (Minn. Oct. 28, 1996); *see also Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 327 (Minn.1993) (declining to apply the doctrine despite claims that a party had asked for and been assured coverage, because "the purchasers of the insurance were experienced business people, and there is nothing in the language of the policies that would raise a reasonable expectation of coverage"); *Austin P. Keller Constr. Co. v. Commercial Union Ins. Co.*, 379 N.W.2d 533, 536 n. 3 (Minn.1986) (finding that the doctrine of reasonable expectations did not apply because the fact that the insured had purchased joint venture liability insurance showed that it "was aware of the difference in the scope of coverages afforded to it as an individual contractor as distinguished from a member of a joint venture").

Although ambiguity is a factor under *Atwater*, not a prerequisite, in the application of the doctrine of reasonable expectations, in no case since *Atwater* have we used the doctrine to provide coverage in contravention of unambiguous policy terms. Moreover, the doctrine has generated criticism and confusion that give us pause. One commentator has observed that "three decades of case law have failed to provide any rules or guidelines for applying the doctrine." John M. Bjorkman, *The Reasonable Expectations Doctrine: An Overview*, 29 A.B.A. The Brief 38, 39 (Summer 2000). Commentators also have expressed concern that the doctrine enables courts to vitiate the unambiguous terms of a policy simply to achieve desirable outcomes. *See id.*; James M. Fischer, *The Doctrine of Reasonable Expectations Is Indispensable, If We Only Knew What For?*, 5 Conn. Ins. L.J. 151, 165 (1998) ("A public policy base for altering and modifying contract obligations is simply a more honest and accurate statement of what [the doctrine] does. Public policy creates coverage when a court believes it is fair, just, and reasonable to do so, notwithstanding the contrary position of the contract terms. A policyholder's expectations have nothing to do with the result, unless they happen to coincide with those of the court."). Against this backdrop, we are unwilling to expand the doctrine of reasonable expectations beyond its current use as a tool for resolving ambiguity and for correcting extreme situations like that in *Atwater*, where a party's coverage is significantly different from what the party reasonably believes it has paid for and where the only notice the party has of that difference is in an obscure and unexpected provision.

In this case, the policy definition of "You" directed the reader to the declarations page. Although the precise term "policyholder" does not appear on that page, the policy did distinguish there between "named insureds" and "drivers," indicating a difference for policy purposes between the two. Although it appears from the record that neither Fay nor the Carlsons ever contemplated the type of accident, and resulting claim, that occurred here, Fay testified that he was generally aware and informed the Carlsons that there were differences in the treatment of named insureds and drivers. Interpreting

the doctrine of reasonable expectations to cover such a situation would expand *Atwater* considerably. We therefore hold that the doctrine of reasonable expectations does not apply to provide the Carlsons with uninsured motorist coverage for Aaron's injuries.

Affirmed.

## DISSENT

ANDERSON, PAUL H., J. (dissenting).

I respectfully dissent. I conclude that the Allstate policy is ambiguous as to whether the term "insured" refers to listed drivers as well as named insureds. I also conclude that the Carlsons reasonably expected that their son Aaron would receive the same coverage as his parents in the event of an accident. Because our precedent requires that we construe ambiguous insurance policy language in accordance with the reasonable expectations of the insured, I would conclude that Aaron is entitled to uninsured motorist coverage for his injuries. Therefore, I would reverse both the court of appeals and district court.

As the majority indicates, the crux of the interpretive question before us rests on who is "the policyholder named on the Policy Declarations." Despite the fact that the word "policyholder" appears nowhere on the declarations page, the majority concludes that this language unambiguously refers to the "named insureds" on the declarations page. I do not agree with this conclusion. On the contrary, I am persuaded that reasonable persons seeking the "policyholder named on the Policy Declarations" would naturally refer to the declarations page, whereupon they would find two different terms, "named insureds" and "drivers," and no mention whatsoever of any "policyholder." Understandably confounded as to who the "policyholder" is,

the reasonable reader would be left considering the terms "named insured" and "driver." Both terms are terms of art in an insurance contract, and neither bears any obvious relationship to the term "policyholder." Therefore, in the mind of an ordinary person with no expertise in the law and insurance, the "policyholder" could plausibly include the "named insureds," the "drivers," or both. This scenario is the very definition of ambiguity—that is, susceptibility to two or more reasonable interpretations. *See Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997).

Having parted ways with the majority on the question of the insurance policy's ambiguity, a divergent analysis necessarily follows. "Ambiguous terms in an insurance policy are to be resolved against the insurer and in accordance with the reasonable expectations of the insured." *Progressive Specialty Ins. Co. v. Widness ex rel. Widness*, 635 N.W.2d 516, 524 (Minn. 2001) (internal quotation marks omitted). Because the policy is ambiguous, the Carlsons are entitled to whatever coverage they reasonably expected.

I conclude that Robert Carlson's expectation that his son Aaron would receive uninsured motorist coverage under these circumstances was reasonable. According to Robert's deposition testimony, which we must credit for purposes of summary judgment, Robert bargained with independent insurance agent Michael Fay for coverage for Aaron and his brother Christopher that was the same as the coverage for Robert and his wife Gail. It appears that any difference in coverage between the named insureds and the drivers was neither explained to Robert nor reflected in a corresponding difference in premiums. There is no evidence that the Carlsons and Allstate bargained for the "gap" in coverage into which Allstate claims Aaron's injuries

have fallen. On the contrary, Fay, the insurance agent through whom Robert purchased the policy, testified that he did not even know such a gap existed. Allstate, a sophisticated insurance company, and not the Carlsons, who tried in good faith to secure comprehensive insurance coverage for Aaron and Christopher, should bear the burden of that oversight in light of the policy's ambiguity. Because I conclude that the policy was ambiguous and that the Carlsons reasonably expected, in light of their reading of the policy and Robert's conversations with Fay, that Aaron would be covered, I would reverse the court of appeals and district court and order that judgment be entered in favor of the Carlsons against Allstate.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

MEYER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.