# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3701

_____

W3i Mobile, LLC,      *
     *
         Appellant,      *
     *    Appeal from the United States
   v.      *    District Court for the
     *    District of Minnesota.
Westchester Fire Insurance Company,    *
     *
         Appellee.      *

_____

Submitted: October 21, 2010
Filed: February 15, 2011

_____

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

W3i Mobile, LLC (W3i) sued Westchester Fire Insurance Company (Westchester), claiming breach of contract and seeking a declaration that an insurance policy required Westchester to defend and indemnify W3i for expenses associated with two class action lawsuits brought against W3i. The district court[1] granted summary judgment in favor of Westchester, finding a products exclusion precluded coverage under the policy. We affirm.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

## I. BACKGROUND

### A. Parties

W3i is a wholly owned subsidiary of W3i Holdings, LLC, a Minnesota limited liability company with its principal place of business in Minnesota and members in Minnesota and California. W3i provides mobile content to cellular telephone users. According to W3i, "mobile content" refers to products and services marketed and sold by W3i "such as ringtones, quizzes, horoscopes, and weather alerts."

Westchester, a New York corporation with its principal place of business in New York, is an indirect subsidiary of ACE Limited. Westchester issued a Business and Management Indemnity Policy (Policy) to W3i, effective January 1, 2008 to January 1, 2009.

### B. Insurance Policy

The Policy contains three coverage sections, including a Directors, Officers and Company (D&O) section. Insuring Clause A.3 of the D&O section obligates Westchester "to pay the Loss of [W3i] which [W3i] becomes legally obligated to pay by reason of a Claim first made against [W3i] . . . for any Wrongful Act." (emphasis omitted). As relevant, the D&O section defines "Claim" to include "a civil proceeding against [W3i] seeking monetary damages . . . , commenced by the service of a complaint or similar pleading."

The D&O section includes various exclusions,[2] including an exclusion applicable only to Clause A.3, providing Westchester "shall not be liable for Loss on account of any Claim . . . alleging, based upon, arising out of, attributable to, directly

---

[2]The D&O section also includes a breach of contract exclusion, which Westchester argues also precludes coverage. Because we conclude the products exclusion precludes coverage, we need not decide whether the policy's breach of contract exclusion does so as well.

or indirectly resulting from, in consequence of, or in any way involving . . . any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by [W3i]" (emphasis omitted) (products exclusion).

### C. Underlying Lawsuits

In September 2008, users of W3i's mobile content filed two class action complaints (underlying claims) against W3i in California and Minnesota state courts.[3] The underlying claims alleged W3i billed cellular telephone users for unauthorized mobile content in violation of various state consumer protection statutes,[4] and constituted tortious interference with a contract and unjust enrichment.

According to the underlying claims, the delivery of mobile content involves (1) mobile content providers, (2) wireless carriers, and (3) aggregators. Content providers such as W3i "create the mobile content and deliver their products by means of cell phone technology." Wireless carriers such as AT&T, Verizon Wireless, and Sprint provide the cellular telephone devices and wireless service to their customers pursuant to contracts with those customers. Aggregators serve as the "middle-men" between the content providers and the wireless carriers, negotiating agreements, as well as "manag[ing] the complex [wireless] carrier relationships, distribution, billing, and customer service."

The three types of businesses often share the revenue generated when customers purchase mobile content. When a customer purchases mobile content, the content provider gives the customer's cellular telephone number and the amount to be charged

---

[3]Both underlying claims were later removed to federal court.

[4]The Minnesota lawsuit alleged W3i engaged in deceptive trade practices in violation of Minn. Stat. §§ 325D.44, 325F.67. The California lawsuit alleged violation of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1770, and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

to the aggregator, who in turn passes this information to the wireless carrier. The wireless carrier then includes the charge on the customer's cellular telephone bill. Once the customer pays for the mobile content, the wireless carrier retains its "revenue share" and remits the balance to the aggregator, who in turn retains its "revenue share" and remits the remainder to the mobile content provider.

The underlying claims allege this system lacks "checks or safeguards to prevent erroneous and unauthorized charges." The likelihood of unauthorized or false charges is increased by "[r]ecycled numbers, misleading 'consent' procedures present when customers sign-up for premium mobile content, [and] the absence of [] signature requirements, age confirmations, or personal code numbers."

### D.    Prior Proceedings

In November 2008, after W3i notified Westchester of the underlying claims and requested coverage, Westchester advised W3i that coverage was not available. W3i filed a breach of contract and declaratory judgment action in federal district court, and Westchester moved for summary judgment. The district court granted Westchester's motion, finding "Westchester ha[d] no duty to defend or indemnify W3i for expenses associated with the [u]nderlying [c]laims." The district court concluded the products exclusion precluded recovery because the underlying claims involved W3i's product and that the illusory coverage doctrine did not apply in these circumstances under Minnesota law.[5] W3i appeals.

---

[5]W3i does not appeal the district court's conclusion that the illusory coverage doctrine does not apply because, as W3i's counsel stated at oral argument, W3i "could not meet the high standard Minnesota [law] requires."

## II. DISCUSSION

We review the district court's grant of summary judgment and its interpretation of state law de novo. Babinski v. Am. Family Ins. Grp., 569 F.3d 349, 351 (8th Cir. 2009). We may affirm a grant of summary judgment "on any grounds supported by the record." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009). "Summary judgment is proper when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. See also Fed. R. Civ. P. 56(a) (amended effective Dec. 1, 2010).

Minnesota law governs our interpretation of the insurance policy in this diversity action. See Babinski, 569 F.3d at 351-52. Under Minnesota law, "[g]eneral principles of contract interpretation apply to insurance policies." Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 45 (Minn. 2008) (quoting Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998)). We must interpret clear and unambiguous policy language "according to plain, ordinary sense so as to effectuate the intentions of the parties." Id. (quoting Canadian Universal Ins. Co. v. Fire Watch, Inc., 258 N.W.2d 570, 572 (Minn. 1977)) (internal quotation marks omitted). "Language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations." Id. While we construe ambiguity in favor of the insured, we "may not . . . read an ambiguity into the plain language of an insurance contract." Hubred v. Control Data Corp., 442 N.W.2d 308, 310 (Minn. 1989).

We agree with the district court that the products exclusion's plain language precludes coverage under the D&O section. The exclusion operates against claims "arising out of, . . . directly or indirectly resulting from, . . . or *in any way involving* . . . products . . . produced, . . . sold, marketed, distributed, . . . or developed by [W3i]." (emphasis added). The two underlying claims allege customers were billed for mobile content, which indisputably is W3i's "product" regardless of whether the bills were erroneous or unauthorized. In other words, the underlying claims charge

-5-

W3i with either erroneously billing for products the customer never received *or* billing for products without proper authorization from the customer. These claims arguably arise out of, or directly or indirectly result from, W3i's developed and marketed product, its mobile content. At the very least, the claims "involve" W3i's mobile content.

We reject W3i's characterization of the underlying claims as billing disputes unaffected by the policy's products exclusion. Accepting this characterization would require us to ignore both the exclusion's plain and unambiguous language and the underlying claims' factual allegations. Nothing in the language of the products exclusion limits its operation to claims which have W3i's products at the core of the claims. Interpreting the exclusion so narrowly would require us to ignore the exclusion's "in any way involving" clause, contrary to Minnesota's rule of contract interpretation. See Hammer v. Investors Life Ins. Co. of N. Am., 511 N.W.2d 6, 8 (Minn. 1994) (explaining "the court is bound to attribute the usual and accepted meaning to [a] phrase [and] . . . is not free to construe the phrase in such a way as to afford coverage"); Gorr v. Consol. Foods Corp., 91 N.W.2d 772, 782 (Minn. 1958) (noting courts cannot disregard clear and unambiguous language in the interest of the insured).

The underlying claims do not exclusively concern W3i's billing practices in isolation of the mobile content, as W3i suggests. The nature of mobile content allows customers to order and receive the product directly to their cellular telephones. The underlying claims allege "the absence of [] signature requirements, age confirmations, or personal code numbers exacerbate the likelihood of unauthorized and false charges." This implies customers are receiving and using mobile content, but are doing so without fully understanding or authorizing the *charges* associated with the mobile content. Therefore, the underlying claims *involve* the use of W3i's product.

-6-

W3i argues the word "involving" is ambiguous because it has many different definitions, including "[t]o have as a necessary feature or consequence; entail." See American Heritage College Dictionary 730 (4th ed. 2007). W3i also points to Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-74 (1995), where the United States Supreme Court interpreted the word "involving" broadly, and concluded it was "the functional equivalent of 'affecting.'" "Because policy exclusions are strictly construed against the insurer," Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 895 (Minn. 2006), W3i contends we must interpret "involving" narrowly and require a cause-and-effect relationship between the mobile content and the underlying claims in order to implicate the products exclusion. Because the district court found no causal connection between W3i's mobile content and the underlying claims existed, W3i argues the products exclusion, interpreted narrowly, is not applicable.

We disagree with W3i because its argument fails to account for our duty to interpret "involving" within the context of its use. "Because a word has more than one meaning does not mean it is ambiguous. The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise." Bd. of Regents of the Univ. of Minn. v. Royal Ins. Co. of Am., 517 N.W.2d 888, 892 (Minn. 1994). In the Westchester products exclusion, "in any way" modifies "involving." As we have recently determined, "[t]he word 'any' when '[r]ead naturally . . . has an expansive meaning.'" Leonard v. Exec. Risk Indem. (In re SRC Holding Corp), 545 F.3d 661, 668 (8th Cir. 2008) (quoting United States v. Gonzales, 520 U.S. 1, 5 (1997)). We find the "in any way" language incorporates all reasonable definitions of the word "involving," including those not requiring a causal connection, such as "to have within or as part of itself." Webster's Third New International Dictionary 1191 (1993).

Relying on cases such as Waseca Mut. Ins. Co. v. Noska, 331 N.W.2d 917 (Minn. 1983), W3i suggests that Minnesota's "independent cause doctrine" compels

coverage because "when two concurrent causes contribute to a loss, one covered by insurance and one not, an insurer may not deny coverage due to the presence of the non-covered loss." We doubt application of this doctrine is appropriate here, but need not address this issue because W3i raised the argument for the first time in its reply brief. See State Auto. Mut. Ins. Co. v. Mitchell, 179 F.3d 590, 592 (8th Cir. 1999) (repeating our general practice against addressing issues and arguments raised for the first time in a reply brief).

Finally, W3i asserts the policy should cover the underlying claims through application of the doctrine of reasonable expectations. W3i claims the district court's interpretation "was contrary to the reasonable expectations of the insured because it effectively nullified [Clause A.3]."

"The doctrine of 'reasonable expectations' protects the 'objectively reasonable expectations' of insureds 'even though painstaking study of the policy provisions would have negated those expectations.'" Jostens, Inc. v. Northfield Ins. Co., 527 N.W.2d 116, 118 (Minn. Ct. App. 1995) (quoting Atwater Creamery v. Western Nat'l Mut. Ins., 366 N.W.2d 271, 277 (Minn. 1985)). The Minnesota Supreme Court has recently discussed at length its limited application of the doctrine, refusing to expand it beyond "use as a tool for resolving ambiguity and for correcting extreme situations . . . where a party's coverage is significantly different from what the party reasonably believes it has paid for and where the only notice the party has of that difference is in an obscure and unexpected provision." Carlson, 749 N.W.2d at 47-49; see Royal Ins., 517 N.W.2d at 891 (refusing to apply the doctrine to the policy's "plainly designated" pollution exclusion). The reasonable expectations doctrine "is not a license to ignore . . . [an] exclusion . . . nor to rewrite the exclusion solely to conform to a result that the insured might prefer." Royal Ins., 517 N.W.2d at 891.

This case involves a commercial insurance policy purchased by experienced business people. See Bob Useldinger & Sons, Inc. v. Hangsleben, 505 N.W.2d 323,

327 (Minn. 1993) (holding it inappropriate to apply the reasonable expectations doctrine where "the purchasers of the insurance were experienced business people"); Atwater Creamery Co., 366 N.W.2d at 277 (advising us the doctrine "is closely related to the doctrine of contracts of adhesion" and particularly applicable "[w]here there is unequal bargaining between the parties"). The Westchester products exclusion used clear and unambiguous language and was plainly labeled under the exclusion section. Were we to apply the doctrine of reasonable expectations here, we would expand the doctrine beyond its current scope under Minnesota law. We decline to do so.

## III.   CONCLUSION

We affirm the district court's judgment.

_____